OUTTEN & GOLDEN LLP
Kathleen Peratis (KP 2118)
Carmelyn P. Malalis (CM 3350)
Tammy Marzigliano (TM 2934)
3 Park Avenue, 29th Floor
New York, New York 10016
(212) 245-1000

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————x

CLAUDIA QUINBY,

        Plaintiff,

        04 Civ. 7406 (WHP) (HP)

– against –

WESTLB AG,

        Defendant.
————————————————————x

DECLARATION OF CARMELYN P. MALALIS IN SUPPORT OF
PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION TO SHIFT THE
COST OF THE PRODUCTION OF ELECTRONIC DISCOVERY

I, Carmelyn P. Malalis, an attorney under penalty of perjury, hereby declare as follows:

    1.    As the Court is aware, Plaintiff has struggled doggedly for access to certain electronic discovery. In Plaintiff's First Request For Production of Documents, she sought such documents by characterizing them according to their subject matter. Defendant noted that it could not possibly examine hundreds of thousands of pages of e-mails and other electronic documents to determine which were responsive to Plaintiff's requests. As an alternative, the parties agreed, and the Court ordered, an electronic search of the mailboxes of certain designated custodians using certain English language

words as search terms (none unique to Ms. Quinby except her name), and for certain time frames. Plaintiff sought these documents because they were crucial to Plaintiff's efforts to support her claims and to respond to WestLB's defenses.

2. Plaintiff has taken seriously the effort – both time and money – that has gone into the electronic production, including the effort of counsel, the parties, the experts and the Court, and has undertaken to review every single document, despite the many hundreds of hours this has required. Plaintiff has not yet completed the task but has reviewed a very large proportion of the unique and responsive documents produced by WestLB in response to the Discovery Order.

3. Based upon that review and as is shown in detail below, we are in a position to answer the first question posed by the Court: in the words of the Court in Zubulake v. UBS Warburg ("Zubulake III"), LLC, 216 F.R.D. 280 (S.D.N.Y. 2003), the e-mail documents provided to Plaintiff pursuant to the Discovery Order are "highly relevant to the issues in this case" and "taken together, they tell a compelling story" in support of and consistent with Ms. Quinby's claims.

4. Plaintiff has undertaken a review from two points of view – quantitative and qualitative. The qualitative review is described below in Paragraphs 6 through 25 and consists of a qualitative analysis of the e-mails produced for the period March through December 2003. This period includes the months in which WestLB: paid Plaintiff to settle her first gender discrimination claim (March 2003); laid off Plaintiff in a so-called "headcount reduction" (June 8, 2003); excluded Plaintiff from the bonuses announced to her peers the day after she was laid off (June 9, 2003); rehired Plaintiff (October 2003); and then harassed Plaintiff and set her up for ultimate discharge

throughout the fall of 2003 (October to December 2003). This analysis shows that the material produced is not just relevant but highly relevant.

5. The quantitative review, described more fully in Paragraphs 26 through 28, consists of a relevance review of all the e-mails produced for a sample month – December 2002 — in the mailboxes for which WestLB seeks cost-shifting. Then, duplicative and non-responsive documents as described in the Supplemental Affidavit of David Manber in Support of Plaintiff's Supplemental Memorandum of Law in Opposition to Defendant's Motion to Shift the Cost of the Production of Electronic Discovery, dated December 2, 2005 ("Manber Supp. Aff.," attached hereto as **Exhibit 1**) – were eliminated and the remaining documents were analyzed for relevance. As is indicated below in Paragraph 26, Plaintiff found that fifty percent are relevant and many of those are highly relevant.

6. The e-mails from the period March through December 2003 (the "2003 E-mails" attached hereto as **Exhibit 2**, and re-stamped Malalis 1 to Malalis 71 for purposes of these opposition papers) that are analyzed in the qualitative review substantiate Plaintiff's long-held version of the facts and contradict in important respects the version that has been advanced by WestLB.

7. There are three significant facts that are uniquely supported by the 2003 E-mails and described in detail below. One, there was substantial hostility toward Plaintiff on the part of her supervisor, Mr. Parker, and other high level managers at WestLB on account of WestLB's settlement of her internal discrimination claim regarding the bonus paid in 2002. Two, the so-called "skills assessment" (attached hereto as **Exhibit 3**) that was purportedly created *before* Ms. Quinby was selected for layoff in

March or April 2003 (see WestLB EEOC Position Statement at 10, dated Jan. 23, 2004, attached hereto as **Exhibit 4**), was apparently not created until months later.  And three, WestLB commenced its plan to document Ms. Quinby's performance deficiencies within weeks of her return to work in October 2003.

8.  First, the 2003 E-mails show that Mr. Parker and other high level managers at WestLB were very hostile to the settlement of Ms. Quinby's first gender discrimination claim.  (Ex. 2 at Malalis 1-5.)  These documents reveal the Head of the New York Branch, Moses Dodo, saying, "we have to settle with the lady as much as we do not like it" (id. at Malalis 1); Patrick Fürer, the joint-CEO of WestLB Panmure Securities Inc. ("WPSI"), saying, "[Ms. Quinby] has at max half a leg to stand on for a complaint" and "I am utterly unhappy about proceedings" (id. at Malalis 4); and Mr. Parker saying, "This puts us in an untenable position."  (id. at Malalis 2).  An e-mail from Betsy Austin to Friedhelm Breuers, who is Global Head of WestLB Equity Markets, makes clear (and this was later established in deposition testimony) that the whole amount paid to Ms. Quinby came out of Mr. Parker's budget.  (Id. at Malalis 5.)  These messages establish deep hostility toward Ms. Quinby and a retaliatory motivation for the subsequent adverse action taken against her.

9.  Next, the 2003 E-mails show that WestLB selected Ms. Quinby for layoff before the settlement of her bonus claim had even been finalized.  Within a week or so of WestLB deciding that it would settle Ms. Quinby's bonus claim, Mr. Parker placed an order (dated February 12, 2003) with an executive search firm for an equity salesperson to do essentially the same job Ms. Quinby was doing.  John Bulicek was identified and an interview was scheduled a few weeks later. (Id. at Malalis 6-12.)

10. In an e-mail from Ms. Austin, Executive Director of WestLB North America Human Resources, to Mr. Breuers and others, dated April 4, 2003, Ms. Austin refers to an impending headcount reduction and cautions Parker to "be very careful who he shares your instructions with" lest "individuals later believe they were terminated for reasons other than the documented, BUSINESS reasons." (Id. at Malalis 13.) This is a not-so-thinly veiled reference to Ms. Quinby and her just-settled bonus dispute, which, according to WestLB, was settled because Mr. Parker had not "documented business reasons" for his underpayment to Ms. Quinby. Ms. Quinby had clearly, as of this time, been selected for "head count reduction" and Ms. Austin was trying to ensure that Mr. Parker created the necessary documents so that the selection of Ms. Quinby appeared to be the result of a fair and impartial process.

11. In early April 2003, Mr. Parker did indeed begin the documentation process, but despite the various "business rationales" he prepared (id. at Malalis 14-26), these documents show that he never filled in the portion in which he purported "objectively" to score all equity salespeople according to an array of criteria in order to select one for layoff. This did not occur until months after Ms. Quinby had in fact been selected.

12. The next ten pages of 2003 E-mails document how eager WestLB was to get Ms. Quinby to leave (id. at Malalis 27 through 36), even though there is no indication that there had been the "skills assessment" that WestLB told the EEOC was the tool pursuant to which Ms. Quinby was chosen for layoff. There is no electronic document showing that the "skills assessment" grid existed or was transmitted at any time before Ms. Quinby was laid off. In fact, the 2003 E-mails comprise strong evidence that Ms.

5

Quinby was selected for layoff and that the skills assessment was then "fixed" around the already-made decision.

13.     In an e-mail dated May 22, 2003, in reaction to Mr. Parker's pressure to get rid of Ms. Quinby as soon as possible, Ms. Austin pointed out that to do so would "wreak [sic] of retaliation." (Id. at Malalis 35.)

14.     Thus, on June 3, 2003, Mr. Dodo, the Head of the New York Branch of WestLB, says in an e-mail to Ms. Austin, "I will request formally Parker to produce documentation that substantiates the dismissal of Claudia." (Id. at Malalis 37.)

15.     In an e-mail dated June 5, 2003, Mr. Parker is said to have told Mr. Dodo that he has prepared the assessment. (Id. at Malalis 38.)

16.     Ms. Quinby was "laid off" in a "headcount reduction" on June 8, 2003, announced on June 9, 2003.

17.     Although Quinby was told that the timing was "out of John's hands," a highly significant e-mail dated April 10, 2003 from Ms. Austin advises Mr. Parker that "[t]he deadline for doing the staff cuts is 100% up to you." (id. at Malalis 25).

18.     Bonuses for Ms. Quinby's peers were determined/announced the day after Ms. Quinby was terminated. (Id. at Malalis 38-43.) Ms. Quinby, of course, did not get one because she was not present and working on the day the bonuses were announced. (E-mail from P. Feuerstein to C. Quinby, dated Mar. 31, 2004, attached as **Exhibit 5**.) The 2003 E-mails provide unique proof in support of Ms. Quinby's claim that depriving her of a bonus in 2003 was contrived, manipulated and retaliatory.

19.     In an e-mail dated June 9, 2003, Ms. Austin advises Joel Cohen regarding Ms. Quinby's claim that Mr. Parker was violating the confidentiality provisions of the

previous settlement agreement. Ms. Austin says, "I told [Ms. Quinby] that was not something I could discuss with her (but it is something that we, The Bank, need to talk about…this is his M.O..….has been problematic with several prior terminations in his group)." (Ex. 2 at Malalis 44.) Again, this e-mail further substantiates Mr. Parker's animus toward Ms. Quinby and substantiates her claims regarding his retaliation.

20. In an e-mail dated June 24, 2003, Mr. Parker continues to create new and additional justifications for laying off Ms. Quinby in the so-called "head count reduction," reasons never communicated to Ms. Quinby. (Id. at Malalis 47-52.)

21. The two other two senior salespeople in equity sales, Patrick Oddoux and Richard James, quit in July/August 2003. In a highly significant e-mail dated September 8, 2003, Mr. Parker states that he has two positions to fill. (Id. at Malalis 57.) Nevertheless, WestLB did not hire two salespeople, but three – including Ms. Quinby to whom it made an unconditional offer of reinstatement on September 13, 2003. She began work on October 14, 2003. This e-mail helps substantiate Ms. Quinby's claim that offering Ms. Quinby reinstatement was an ad hoc and cynical act intended to insulate the bank from liability to her for front pay going forward, especially in light of other evidence that WestLB officials made the offer in the expectation that Ms. Quinby would reject it.

22. Ms. Quinby did not reject the offer. However, no sooner had she recommenced work at WestLB than WestLB began to lay the groundwork for her discharge. An e-mail dated November 24, 2004, when Ms. Quinby had been on the job for barely a month, confirms that Mr. Parker, Janine Cristiano the new Head of Human Resources, and Mr. Breuers had already begun to have "conversations" about Ms.

7

Quinby.  (Id. at Malalis 61 through 66.)  This is consistent with Ms. Quinby's testimony that WestLB wanted her to leave virtually from the moment she was reinstated.

23.     The end for Ms. Quinby is contained in Mr. Parker's e-mail dated January 14, 2004, stating, "It is decision time. . . .  This means resolving the Claudia issue . . . ." (Id. at Malalis 68 through 69.)  A week later, on January 20, 2004, Mr. Parker began creating documents describing Ms. Quinby's poor performance and holding a series of meetings with her to discuss with her this allegedly poor performance.  In April 2003, after he had created a number of such documents and held a number of such meetings, he fired her.

24.     If Plaintiff had not obtained the electronic production, WestLB could have continued to tell the same story it told the EEOC in its Position Statement (see Ex. 4) and at various meetings regarding this matter – that no one had any animus against Ms. Quinby on account of the settlement of her bonus claim in early 2003, that Ms. Quinby was selected for layoff in June 2003 following a fair and objective skills assessment, that Ms. Quinby was not paid a bonus in 2003 because she was not on the payroll at the time it was announced, that she was brought back in October 2003 in good faith, and that she was fired in April 2004 as a result of her own deficiencies.

25.     Plainly, on a qualitative basis, the 2003 E-mails are, in the words of Zubulake v. UBS Warburg, LLC, 216 F.R.D. 280 (S.D.N.Y. 2003), "highly relevant to the issues in this case" and "taken together, they tell a compelling story" in support of and consistent with Ms. Quinby's claims.

26.     As for the Zubulake-like sampling method used for quantitative analysis of all of the electronic production from the month of December 2002, the Supplemental

Affidavit of David Manber shows that there are thirty eight responsive documents in the mailboxes of users for whom WestLB is seeking cost shifting. Of those thirty eight documents, we have determined that nineteen of them are relevant, for a percentage relevance rate of 50 percent. (Manber Supp. Aff. ¶ 11 and Ex. B, at Ex. 1.)

27. The relevant documents from the December 2002 test (attached as **Exhibit 6**; see Manber Supp. Aff. Ex. B, at Ex. 1) show that:

- a. Ms. Austin, the Head of Human Resources, instructs her staff not to put certain material in the files of employees stating it is "dangerous" to put certain material in an employee's file and admits to having removed such material herself (Ex. 6 at Malalis 72, 73);

- b. Ms. Austin, the Head of Human Resources, states that she is gathering information because she is "investigating a discrimination complaint" (Quinby's), a characterization that is contrary to Ms. Austin's testimony (id. at Malalis 74);

- c. Mr. Parker may have changed the 2001 bonus amounts in Ms. Quinby's group as they had been determined by top management in London (id. at Malalis 75, 76);

- d. Ms. Austin, the Head of Human Resources, in seven separate documents gathered pay and bonus information concerning equity salespeople globally in developing a proposal to settle Ms. Quinby's bonus discrimination claim (id. at Malalis 77-81, 82-85, 86-89, 90-92, 93-94, 95, 96-100);

e. a highly relevant analysis of the compensation of males and females in WestLB (id. at Malalis 101-103);

f. an analysis of New York Equity Department 2001 bonus payments (id. at Malalis 104);

g. documentation concerning a discrimination claim, demanding a settlement figure far larger than Ms. Quinby's although WestLB has described Ms. Quinby's demand as "astronomical" and "ridiculous"; documents concerning settlement of another discrimination claim that WestLB's lawyers "were quite relieved not to have to defend …"(id. at Malalis 105-106, 107, 108-109, 110);

h. documentation that 2002 bonuses were paid to WestLB employees in March 2003 (id. at Malalis 111);

i. documents that describe equity department headcount and WestLB branch's salary and bonus structure (id. at Malalis 112-114, 115-124).

28. Among the costs Defendant seeks to shift to Plaintiff include costs for re-producing "the dii load files requested by Plaintiff" (Def. Supp. Mem. at 6; 2nd Carey Supp. Aff. ¶¶ 10, 11). This request is absurd given the fact that Defendant agreed to re-produce these files at no cost to Plaintiff, since it was due to Defendant's mistake that the files had to be re-produced in the first place. (See Affidavit of Melanie Cristol, dated December 2, 2005, attached hereto as **Exhibit 7**.)

29. On July 20, 2005, I spoke with Andrew Baron, an associate at McDermott Will & Emery LLP, counsel to Defendant. Mr. Baron told me that Defendant would produce the documents subject to the Discovery Order in an electronically searchable

format.  I told Mr. Baron that we would be using the program Summation to review the files.  Mr. Baron asked me to have someone contact him directly with the specifications Plaintiff needed the documents in for loading into Summation.  As a result, I arranged for him to speak with Melanie Cristol, a paralegal at our firm.

30. On August 4, 2005, after WestLB had failed to produce the electronic documents according to the specifications they requested and in which it had agreed to produce the documents, I called Mr. Baron.  In two separate conference calls with Mr. Baron, at which Ms. Cristol and our consultants from Array Technology were present, I informed Mr. Baron about the defects, and he promised that WestLB would re-produce the two flawed productions at no cost to Plaintiff, as it had been Defendant's mistake that necessitated the re-productions in the first place.

31. Because WestLB agreed that Plaintiff would not have to pay the costs of re-producing the first two electronic productions, it cannot now renege on that agreement. Therefore, its request for costs associated with this re-production should be denied.

32. Attached hereto as **Exhibit 8** is the Supplemental Affidavit of Kevin Faulkner in Support of Plaintiff's Supplemental Memorandum of Law in Opposition to Defendant's Motion to Shift the Cost of the Production of Electronic Discovery, dated December 2, 2005

Dated: New York, New York
         December 2, 2005

                                      /s/ Carmelyn P. Malalis
                                      Kathleen Peratis (KP 2118)
                                      Carmelyn P. Malalis (CM 3350)

                         Tammy Marzigliano (TM 2934)
                         OUTTEN & GOLDEN LLP
                         3 Park Avenue, 29th Floor
                         New York, NY  10016
                         Telephone:  (212) 245-1000
                         Attorneys for Plaintiff

To: Dawn Darringer, Esq.
    McDermott Will & Emery
    50 Rockefeller Plaza
    New York, NY
    10020-1605