UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12-15-05

CLAUDIA QUINBY,                         :

                        Plaintiff,      :    04 Civ. 7406 (WHP)(HBP)

        -against-                       :    OPINION
                                             AND ORDER
WESTLB AG,                              :

                        Defendant.      :

------------------------------------X

        PITMAN, United States Magistrate Judge:

I.    Introduction

        Plaintiff moves for sanctions including reasonable
attorney's fees and costs against defendant and defendant's
counsel, McDermott Will & Emery LLP ("MWE"), pursuant to Federal
Rules of Civil Procedure Rules 26(g)(3), 37(b)(2) and 37(c)(1),
28 U.S.C. § 1927 and the inherent powers of the court.  For the
reasons set forth below, plaintiff's motion is denied.

II.   Facts

        Plaintiff's motion arises out of a contentious discov-
ery dispute concerning the production of various e-mails in
defendant's possession.

        In brief, the complaint in this matter alleges gender
discrimination in violation of Title VII (Complaint ("Compl.") at
¶ 1).  Plaintiff was an Associate Director/Vice President in the

Equity Markets Group of WestLB from May 1999 to June 2003 and again from September 2003 to April 2004 (Compl. ¶¶ 9, 44, 48, 57). Plaintiff claims, inter alia, that similarly situated male employees were consistently given higher pay than female employees, including plaintiff, and that she was ultimately terminated because of her gender (Compl. ¶¶ 1, 65, 67, 69).

The current dispute stems from plaintiff's first request for production of documents, served on February 18, 2005 (Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Sanctions Under Rules 26(g)(3), 37(b)(2), and 37(c)(1) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the Inherent Powers of the Court ("Pl. Memo."), Docket Item 37, at 2). There, plaintiff requested that seventeen current and former WestLB employees' e-mail accounts be searched for certain terms alleged to refer to plaintiff in particular or that are sexist in general. The request also sought e-mails relating to discrimination against other women at WestLB and e-mails showing that men were more highly compensated than women (Plaintiff's First Request for Production of Documents, annexed as Exhibit 1 to Affidavit of Dawn J. Groman, Esq., sworn to October 3, 2005 ("Groman Aff."), Docket Item 43, at ¶¶ 10-21, 25-26, 31-32).

Defendant objected to many of the requests for electronic discovery claiming they were overly broad and would result in undue burden. The parties were unable to agree on the scope

2

of electronic discovery and sought the intervention of the Court to resolve the dispute (Groman Aff. ¶ 2).

At a June 8, 2005 discovery conference before the Honorable William H. Pauley, III, United States District Judge, defendant claimed that e-mails sought by plaintiff are not readily available because they are on back-up tapes and would, therefore, be expensive to retrieve (June 8, 2005 Hearing Transcript at 4). Following the conference, Judge Pauley referred the dispute to me.

On June 22, 2005, after meeting with counsel, I ordered defendant to provide counsel for plaintiff with an affidavit addressing the technical issues raised by plaintiff's discovery requests for e-mails and other electronic communications. Specifically, I directed the parties' attention to Zubulake v. UBS Warburg LLC, 217 F.R.D. 309 (S.D.N.Y. 2003), and further directed that the affidavits address the devices defendant used to store data and the seven factors identified in Zubulake. Defendant was also ordered to produce a deposition witness who could discuss the issues to be addressed in the affidavit and to restore, as a sample, the back-up tape or tapes that contain e-mails from February 2003 into a readable, searchable format (June 22, 2005 Order ("6/22/05 Order"), Docket Item 19).

On June 27, 2005 defendant's counsel, MWE, sent two affidavits to plaintiff's counsel, with copies to me. The

affidavits were executed by Kenneth Bigelow, WestLB's chief
information officer, and Stuart Hanley, an electronic evidence
consultant employed by Kroll Ontrack ("Kroll"), "a consulting
firm that specializes in the retrieval and restoration of elec-
tronic information stored on back-up tapes and other media
storage devices" that was hired by defendant to assist in restor-
ing and searching defendant's back-up tapes (Affidavit of Stuart
Hanley, sworn to June 27, 2005 ("Hanley Aff."), annexed as
Exhibit 5 to Declaration of Carmelyn P. Malalis, Esq., in Support
of Plaintiff's Motion for Sanctions Under Rules 26(g)(3),
37(b)(2), and 37(c)(1) of the Federal Rules of Civil Procedure,
28 U.S.C. § 1927, and the Inherent Powers of the Court dated
September 12, 2005 ("Malalis Decl."), Docket Item 30, at ¶¶ 1-2).
MWE transmitted a signed cover letter with the affidavits stating
"enclosed are the Affidavits . . . that address the technical and
cost issues raised by Plaintiff's discovery requests" (June 27,
2005 Letter from Andrew S. Baron, Esq., to Kathleen Peratis,
Esq., annexed as Exhibit 3 to Malalis Decl.).

     Bigelow's affidavit stated that retrieving the e-mails
plaintiff had requested "will be extremely costly, time-consuming
and unduly burdensome" and that defendant has hired Kroll to
assist in collecting any responsive e-mails (Affidavit of Kenneth
Bigelow, sworn to June 27, 2005 ("Bigelow Aff."), annexed as
Exhibit 4 to Malalis Decl., at ¶ 3). He also stated that

4

defendant stores its e-mails on a Lotus Notes e-mail server
("server" or "Database") which "exists on a computer server and
is accessible through each individual user's e-mail account"
(Bigelow Aff. ¶ 5). According to Bigelow, the e-mails are
backed-up on tapes to prevent the permanent loss of data and for
long-term storage; the back-up tapes are essentially a "snapshot"
of the e-mail server at a point in time. Accordingly, Bigelow
stated that any e-mail that is sent or received and then deleted
before a snapshot can be taken will not be stored on a back-up
tape. Furthermore, Bigelow noted that because some employees
store e-mails for extended periods of time and the back-up tapes
cannot differentiate between new and old data, the tapes contain
copies of many identical e-mails. Bigelow stated that there is
software available that can segregate identical e-mails to
prevent the production of copies, but the more copies there are,
the longer the process of detecting and removing the copies will
be (Bigelow Aff. ¶¶ 5-6, 8, 10).

Bigelow stated that defendant also creates and stores
daily, monthly and annual back-up tapes and has approximately
3,754 of such back-up tapes covering January 2, 2004 to January
4, 2005, 21 tapes in total for "year-end" 2003, 35 tapes for
"year-end" 2004 and 42 annual back-up tapes for 2001 and 2002
(Bigelow Aff. ¶ 10).

Bigelow also discussed an e-mail system called "AXS-One." AXS-One automatically stores e-mails from employees who are registered broker-dealers. Bigelow estimated that it would take approximately two weeks and $30,000 to search AXS-One (Bigelow Aff. ¶ 7).

Hanley's affidavit described the costs and amount of time it will take to restore back-up tapes. Hanley stated that, to search data on back-up tapes, Kroll must restore the tapes by "uncompressing" the data on each tape onto a computer server (Hanley Aff. ¶ 9). Hanley estimated that it would cost approximately $106,000 to restore defendant's 98 yearly back-up tapes and $2.8 million to restore the more than 3,700 other back-up tapes from 2004. The time it would take to restore each tape varies by how much data is stored on the tape and Hanley estimated that it could take approximately eight to ten hours to "duplicate, restore and convert" an individual tape and two to four weeks to "restore and convert" the 98 yearly tapes (Hanley Aff. ¶¶ 9, 11-12).

Hanley also stated that Kroll had previously restored defendant's 2002 back-up tapes but that the data was subsequently recompressed (Hanley Aff. ¶ 12 n.3).

Plaintiff deposed Bigelow and Hanley on July 1, 2005. Plaintiff claims that it was not until the depositions that she learned "that a large quantity of the e-mails Plaintiff had

6

requested going back to 2000 are already readily accessible and readable on WestLB's databases and can be accessed just like 'opening any e-mail'" (Pl. Memo. at 6, quoting July 1, 2005 Deposition of Kenneth Bigelow ("Bigelow Dep."), annexed as Exhibit 6 to Malalis Decl., at 93). Plaintiff also claims to have learned at the depositions that copies of defendant's e-mails exist on the Lotus Notes server, AXS-One and archive tapes owned by Kroll which are "faster and less costly" to access (Pl. Memo. at 8-9).

Plaintiff argues that the Bigelow and Hanley affidavits are incomplete, misleading and contain "outright false statements" because they improperly focused on back-up tapes and violated my Order by not addressing the costs of searching and contents of the Database and archives that Kroll maintains containing WestLB e-mails (Pl. Memo. at 4-6, 13-17). Plaintiff also claims that defendant and MWE made misleading statements before Judge Pauley by not fully revealing "the extent of the e-mails [defendant] possesses and how they are stored" and failed to correct their statements at subsequent hearings before me (Pl. Memo. at 12-13).

III.  Analysis

A.  Applicable Legal Principles

1.  Rule 26(g)(3)

Rule 26(g)(2) of the Federal Rules of Civil Procedure requires an attorney to sign all discovery requests, responses and objections and that the attorney's signature constitutes a certification that to the "best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the request, response, or objection is:  . . . (B) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."  Rule 26(g)(2) is enforceable by way of Rule 26(g)(3) which states:

> If without substantial justification a certification
> is made in violation of the rule, the court, upon
> motion or upon its own initiative, shall impose upon
> the person who made the certification, the party on
> whose behalf the disclosure, request, response, or
> objection is made, or both, an appropriate sanction,
> which may include an order to pay the amount of the
> reasonable expenses incurred because of the violation,
> including a reasonable attorney's fee.

The purpose of Rule 26(g) is to create "an affirmative duty to engage in pretrial discovery in a responsible manner." Fed.R.Civ.P. 26(g) Advisory Committee Notes to 1983 Amendments. The attorney's signature is not a certification of the truthfulness of the client's responses.  "Rather, the signature certifies that the lawyer has made a reasonable effort to assure that the

8

client has provided all the information and documents available to him that are responsive to the discovery demand." Fed.R.Civ.-P. 26(g) Advisory Committee Notes to 1983 Amendments.

An attorney has made a "reasonable inquiry" if the "investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. . . . Ultimately, what is reasonable is a matter for the court to decide on the totality of the circumstances." Fed.R.Civ.P. 26(g) Advisory Committee Notes to 1983 Amendments. Sanctions shall be imposed, however, only if a certification made in violation of Rule 26(g)(2) is made without "substantial justification." Rule 26(g)(3).

"Imposition of sanctions for a violation of Rule 26(g) is mandatory." Clark v. Westchester County, 96 Civ. 8381 (DLC), 1998 WL 709834 at *9 (S.D.N.Y. Oct. 9, 1998), citing, inter alia, Chambers v. NASCO, Inc., 501 U.S. 32, 51 (1991).

## 2. Rule 37(b)(2)[1]

Rule 37(b)(2) states that a court may grant sanctions against a party that "fails to obey an order to provide or permit discovery." Sanctions may be granted against a party under Rule 37(b)(2) if there is noncompliance with an order, "notwithstanding a lack of wilfulness or bad faith, although such factors 'are relevant . . . to the sanction to be imposed for the failure.'" Auscape Int'l v. Nat'l Geographic Soc'y, 02 Civ. 6441 (LAK), 2003 WL 134989 at *4 (S.D.N.Y. Jan. 17, 2003), quoting 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice & Procedure § 2283, at 608 (2d ed. 1994); see Melendez v. Ill. Bell Tel. Co., 79 F.3d 661, 671 (7th Cir. 1996) ("Bad faith . . . is not required for a district court to sanction a party for discovery abuses. Sanctions are proper upon a finding of wilfulness, bad faith, or fault on the part of the noncomplying litigant." (citations omitted)); Alexander v. Fed. Bureau of Investigation, 186 F.R.D. 78, 88 (D.D.C. 1998) ("In making the determination of

---

[1]Plaintiff also brings her motion under Rule 37(c)(1) which authorizes sanctions against a party who fails to disclose information required under Rule 26(a) or (e)(1) or to amend a prior response as required by 26(e)(2). Plaintiff claims that defendant's and MWE's "misleading representations during the June 8th Conference and the June 22nd Conference imposed economic harm on Plaintiff and are sanctionable under Rule 37(c)(1)" (Pl. Memo. at 13). On its face subdivisions (a)(1), (e)(1) and (e)(2) of Rule 26 are not applicable to oral representations to the Court. Thus, it is improper to bring a Rule 37(c)(1) motion for alleged oral misrepresentations to the Court.

10

whether to impose sanctions, Rule 37(b)(2) does not require a
showing of willfulness or bad faith as a prerequisite to the
imposition of sanctions upon a party." (citations omitted)). The
decision to impose sanctions "is committed to the sound discre-
tion of the district court and may not be reversed absent an
abuse of discretion." Luft v. Crown Publishers, Inc., 906 F.2d
862, 865 (2d Cir. 1990), citing, inter alia, Nat'l Hockey League
v. Metro. Hockey Club, Inc., 427 U.S. 639, 642 (1976) (per
curiam); see Friends of Animals, Inc. v. U.S. Surgical Corp., 131
F.3d 332, 334 (2d Cir. 1997) ("A district court has broad power
to impose Rule 37(b) sanctions in response to abusive litigation
practices." (citation omitted)). Rule 37(b)(2) sanctions are
applicable where, as plaintiff alleges here, an affidavit pre-
pared in response to a court order does not comply with the
order. See Nike, Inc. v. Top Brand Co., 216 F.R.D. 259, 269
(S.D.N.Y. 2003) (imposing 37(b)(2) sanctions against party for
failing to disclose the information the court ordered disclosed
in an affidavit).

### 3. 28 U.S.C. § 1927

Section 1927 provides that "[a]ny attorney . . . who so
multiplies the proceedings in any case unreasonably and vexa-
tiously may be required by the court to satisfy personally the
excess costs, expenses, and attorney's fees reasonably incurred

because of such conduct." "This provision 'imposes an obligation
on attorneys throughout the entire litigation to avoid dilatory
tactics' and applies only to attorneys. The purpose of § 1927 is
to deter unnecessary delays in ligation by penalizing attorneys
personally." Nike, Inc. v. Top Brand Co., supra, 216 F.R.D. at
275-76, quoting Bowler v. U.S. Immigration & Naturalization
Serv., 901 F. Supp. 597, 604 (S.D.N.Y. 1995); see also Revson v.
Cinque & Cinque, P.C., 221 F.3d 71, 78-79 (2d Cir. 2000).

A showing of bad faith is required to impose sanctions
under § 1927. Revson v. Cinque & Cinque, P.C., supra, 221 F.3d
at 79 (citation omitted); Oliveri v. Thompson, 803 F.2d at 1265,
1273 (2d Cir. 1986) ("Imposition of a sanction under § 1927
requires a clear showing of bad faith." (internal quotation
omitted)). "Like an award made pursuant to the court's inherent
power, an award under § 1927 is proper when the attorney's
actions are so completely without merit as to require the conclu-
sion that they must have been undertaken for some improper
purpose such as delay." Oliveri v. Thompson, supra, 803 F.2d at
1273 (citation omitted). Thus, to impose sanctions under § 1927,
the court must "find clear evidence that (1) the offending
party's claims were entirely meritless and (2) the party acted

for improper purposes." <u>Agee v. Paramount Communications, Inc.</u>, 114 F.3d 395, 398 (2d Cir. 1997) (citations omitted).[2]

## B. Plaintiff's Claims

Each of plaintiff's claims are based on substantially the same factual predicates, namely that: (1) WestLB and MWE should have disclosed that "the vast quantities of the e-mails . . . were in fact readily and easily accessible and did not reside solely on expensive back-up tapes" (Pl. Memo. at 1); (2) WestLB's and MWE's representations to plaintiff and the Court were designed to delay discovery and increase the costs of litigation (Pl. Memo. at 11, 18); (3) the Bigelow and Hanley affidavits omitted material facts, contained "outright false statements," and furthermore did not comply with the Order directing the affidavits to "'address[] the technical issues raised by [p]laintiff's discovery requests for e-mails and other electronic communications'" with reference to <u>Zubulake v. UBS Warburg LLC</u>, <u>supra</u>, 217 F.R.D. at 309 (Pl. Memo. at 13-14, <u>quoting</u> 6/22/05 Order), and (4) plaintiff did not learn that the e-mails she had requested were "readily accessible and readable, as near-line data" until deposing Bigelow and Hanley (Pl. Memo. at 17).

---

[2]Plaintiff makes a perfunctory claim that sanctions should also be imposed under the inherent powers of the court but fails to address the applicable standards and fails to explain how those standards are met here. Because plaintiff has not briefed this claim in her memorandum of law, I do not address it.

Plaintiff claims that she should be reimbursed for legal fees and costs incurred for discovering that most of the requested e-mails were readily and easily accessible and were not stored solely on back-up tapes, something that plaintiff claims defendant and MWE should have disclosed months earlier (Pl. Memo. at 1).

Defendant and MWE argue in response that they have not made any misrepresentations regarding e-mail discovery or violated the June 22 Order because, as they have stated from the outset, most of the e-mails plaintiff wants to search are either available only on back-up tapes or, if available from some other source, because the back-up tapes are the best, most complete source of the e-mails. Defendant and MWE contend, therefore, that there was no need to discuss alternative, inferior sources in great detail. Thus, defendant and MWE claim that they have focused primarily on the back-up tapes and not other sources because the back-up tapes are the most complete source of stored e-mails and would have to have been searched in any event (Memorandum of Law of Defendant and MWE in Opposition to Plaintiff's Motion for Sanctions ("Def. Memo."), Docket Item 45, at 12-18). Second, they argue that where "there is no evidence of bad faith and no evidence that a party without justification failed to comply with a court order or satisfy its disclosure obligations, a request for sanctions must be denied" (Def. Memo. at 11). Finally, they claim that plaintiff's argument defies logic -- if

14

the e-mails were readily available in an easily accessible

format, it would be irrational for defendant and MWE to claim the

requested e-mails were only on back-up tapes and thereby incur

the burden and expense of retrieving the e-mails from the back-up

tapes (Def. Memo. at 11-12).

I find that defendant and MWE acted appropriately in

focusing on back-up tapes as the most complete source for the

requested e-mails and that they did not mislead plaintiff or the

Court with regard to other available storage systems because the

other systems contained far less data.  Thus, I find that sanc-

tions should not be imposed on defendant or MWE under any of the

theories asserted by plaintiff.

> 1.  The Back-Up Tapes Are
>     the Best Source for the
>     Requested E-mails

Defendant and MWE were correct to concentrate on the

back-up tapes because they were the most complete source for the

e-mails and retrieving the e-mails from any other source would

have resulted in either an incomplete production or duplication

of effort.

WestLB stores e-mails in three locations:  the Lotus

Notes Database, AXS-One and back-up tapes.  The Lotus Notes

Database stores e-mails on a server and is accessible through

individual users' e-mail accounts (Bigelow Aff. ¶ 5).[3]  E-mails

on Lotus Notes can be deleted at any time by the owner of the e-

mail account in which the e-mail is stored (Bigelow Dep. at 51,

57, 86-87, 100).  Until 2002 defendant had a two-year rolling e-

mail deletion policy; in other words any e-mails stored on the

server that were more than two years old would automatically be

deleted.  Defendant ceased that practice in November 2002 and,

thus, the rolling e-mail deletion policy would not have effected

e-mails stored after November 2000, two years earlier (Bigelow

Dep. at 57, 84).  The data available on the Database is search-

able (Bigelow Dep. at 58, 87), but conducting a search of the

Database, complete with the associated metadata,[4] requires the

expertise of an outside consultant (Affidavit of Michael

_____

[3]The Lotus Notes Database is an active, on-line database.
Such a storage device was described in Zubulake:

> On-line storage is generally provided by magnetic disk.
> It is used in the very active stages of an electronic
> records['] life -- when it is being created or received
> and processed, as well as when the access frequency is
> high and the required speed of access is very fast,
> i.e., milliseconds.  Examples of online data include
> hard drives.

Zubulake v. UBS Warburg, LLC, supra, 217 F.R.D. at 318 (internal
quotation and footnote omitted).

[4]Metadata means "data about data.  It describes 'how and
when and by whom a particular set of data was collected, and how
the data is formatted.'"  Madison River Mgmt. Co. v. Bus. Mgmt.
Software Corp., 387 F. Supp.2d 521, 528 n.5 (M.D.N.C. 2005),
quoting Webopedia, Jupitermedia Corp., at
http://www.webopedia.com (last modified Apr. 20, 2004).

Waxenberg, sworn to September 29, 2005 ("Waxenberg Aff."), Docket
Item 44, at ¶ 6). Defendant, as part of its regular business
practices, also deletes an employee's e-mail account when the
employee ceases working for defendant (Bigelow Dep. at 56).
Further, foreign employees do not have e-mail accounts saved on
the Database (Affidavit of Kenneth Bigelow, sworn to July 23,
2005 ("Bigelow Supp. Aff."), annexed as Exhibit 2 to Groman Aff.,
at ¶ 4 n.1).

Only four of the seventeen employees whose e-mail is
sought by plaintiff have e-mail accounts stored on the Database.
The other thirteen have either left WestLB or are foreign
employees (Bigelow Supp. Aff. ¶¶ 4 n.1, 5 n.3, 6 n.4).

Defendant also stores some e-mails on a system called
"AXS-One" that was implemented in 2003. AXS-One is used to store
e-mails that are sent and received between registered broker-
dealers employed by defendant and their customers (Bigelow Aff. ¶
7; Bigelow Dep. at 88-89).[5] AXS-One is linked to the Lotus Notes
Database and automatically makes copies of those e-mails that it
stores (Bigelow Dep. at 90). The e-mails are stored on optical
storage media,[6] which are more accessible than back-up tapes and

_____

[5]Only five of the e-mail accounts that plaintiff sought to
have searched have e-mails saved to AXS-One. The other employees
are either not registered broker-dealers or were terminated
before AXS-One was implemented (Bigelow Supp. Aff. ¶ 9, 9 n.5).

[6]As described in Zubulake, optical storage media
(continued...)

17

can be searched the same way as the Lotus Notes Database[7]

(Bigelow Aff. ¶ 7; Bigelow Dep. at 92).

---

[6](...continued)
> typically consists of a robotic storage device (robotic
> library) that houses removable media, uses robotic arms
> to access the media, and uses multiple read/write
> devices to store and retrieve records. Access speeds
> can range from as low as milliseconds if the media is
> already in a read device, up to 10-30 seconds for
> optical disk technology, and between 20-120 seconds for
> sequentially searched media, such as magnetic tape.
> Examples include optical disks.

Zubulake v. UBS Warburg, LLC, supra, 217 F.R.D. at 318-19
(internal quotation and footnote omitted).

[7]Since Bigelow's deposition, defendant has attempted to
conduct searches on AXS-One but, due to technical errors, has
been unable to complete most searches successfully. Those
searches that have been successful have been impossible to export
onto a different system. Thus, the only way the results of those
searches can be reviewed is by using a computer on defendant's
premises (Waxenberg Aff. ¶ 5).

Finally, defendant also stores data on back-up tapes.[8] Bigelow describes the data stored on back-up tapes as "essentially a 'snapshot' of all the e-mails in each employee's e-mail account at the time the 'snapshot' is taken" (Bigelow Aff. ¶ 8). Because the back-up tapes are "snapshots," taken at a particular point in time, e-mails that are sent or received and then deleted between snapshots will not be captured onto back-up tapes. For example, if the back-up tapes are created every night at 11:00 and on a particular afternoon an employee receives and

---

[8]Back-up tapes have been described as

> [a] device, like a tape recorder, that reads data from and writes it onto a tape. Tape drives have data capacities of anywhere from a few hundred kilobytes to several gigabytes. Their transfer speeds also vary considerably . . . [.] The disadvantage of tape drives is that they are sequential-access devices, which means that to read any particular block of data, you need to read all the preceding blocks. As a result, [t]he data on a backup tape are not organized for retrieval of individual documents or files [because] . . . the organization of the data mirrors the computer's structure, not the human records management structure. Backup tapes also typically employ some sort of data compression, permitting more data to be stored on each tape, but also making restoration more time-consuming and expensive, especially given the lack of uniform standard governing data compression.

Zubulake v. UBS Warburg, LLC, supra, 217 F.R.D. at 319 (internal quotes and footnotes omitted). Back-up tapes are considered an inaccessible format and not readily usable. Data stored on back-up tapes becomes usable when fragmented data contained on the tapes are unfragmented and erased data is reconstructed. Zubulake v. UBS Warburg, LLC, supra, 217 F.R.D. at 319-20.

19

then immediately deletes an e-mail, all before 11:00, that e-mail will not be stored on a back-up tape (Bigelow Aff. ¶ 10).

Defendant's computer systems create daily back-up tapes, consisting of about twenty to forty tapes. One of the daily sets of back-up tapes created towards the end of each month and the tapes created on December 31 of each year are designated as the monthly or annual back-up tapes, respectively (Bigelow Aff. ¶ 8). Defendant stores daily back-up tapes for fifteen weeks and then recycles the tapes. Similarly, monthly tapes are stored for thirteen months before they are recycled and annual tapes for two years (Bigelow Dep. at 36, 83).

Defendant and MWE have consistently represented that the best and most complete method of locating and producing the e-mails requested by plaintiff is to restore back-up tapes and search the restored data (e.g., June 8, 2005 Hearing Transcript at 4; Bigelow Aff. ¶ 6; Def. Memo. at 11-19; Groman Aff. ¶ 9). Although each of defendant's e-mail storage systems has some limitations, I agree that the back-up tapes will produce the most complete results and defendant and MWE were correct to focus on the back-up tapes as the primary method of production.

The back-up tapes are the best source for e-mails because they are the most complete source: back-up tapes contain everything on the server at a particular moment in time. Depending on when a particular back-up tape was made, the data on it

could include e-mails from current, former and foreign employees over a long period of time. By contrast, the data on WestLB's Lotus Notes Database and the AXS-One system will be far less complete. First, the Database only contains data for four individual's e-mail accounts -- the individuals who are current, domestic employees. Second, e-mails deleted by those individuals who still have accounts on the Database will not be retrievable on the Database; they may, however, be retrievable from the back-up tapes if they were captured before they were deleted.

As for the AXS-One system, it only contains e-mails between broker-dealers and customers and for a limited period of time. Defendant points out that this system was implemented in late 2003 and, because plaintiff was laid off in June 2003, rehired in October 2003 and terminated in April 2004, the system probably contains only "a minuscule portion of the e-mails being requested by plaintiff" (Def. Memo. at 5; see Bigelow Aff. ¶ 7; Bigelow Supp. Aff. ¶ 9, 9 n.5). Furthermore, it has been difficult to search the AXS-One system due to technical problems. The only advantage to searching the AXS-One system is that if a particular e-mail falls into the parameters necessary for AXS-One to store the e-mail, even if it is erased by the user before it is backed-up on tape, it will still be stored on AXS-One. Plaintiff has not claimed that there are any e-mails captured on AXS-One that are not available on back-up tapes.

Thus, because the back-up tapes contain the most
complete source of e-mails -- covering all the relevant e-mail
accounts and most, if not all, of the time periods for which
plaintiff seeks e-mails -- and the alternative sources only cover
a narrow time frame, a limited number of users and the data on
these sources can be incomplete, it was logical for defendants to
consider the back-up tapes to be the primary source for the
production of the e-mails.  Indeed, if defendant had even sug-
gested the Database or AXS-One system be searched in the first
instance, plaintiff would probably take defendant to task for
limiting its search to a source that defendant knew was not the
most complete.

Plaintiff also faults the affiants' failure to disclose
the cost of restoring and contents of archive tapes owned by
Kroll (the "Kroll Archives") (Pl. Memo at 9, 17).  The Kroll
Archives are back-up tapes maintained by Kroll that contain data
collected from defendant's Database as a result of earlier
projects Kroll performed for defendant.  The data collected for
those projects had been in a readily accessible format, but,
after the projects ended, Kroll archived the data onto Kroll's
own back-up tapes, making the data inaccessible.  Because these
tapes are formatted slightly differently than defendant's own
back-up tapes, they are slightly easier and cheaper for Kroll to
access than defendant's back-up tapes (Hanley Dep. at 21-26, 38,

22

40-41, 50-51, 64). Plaintiff wrongly suggests that the Kroll

Archives are in a readily accessible format and faults Bigelow

and Hanley for failing to disclose the Archives' restoration

costs and contents in their affidavits (Pl. Memo. at 9, 17). The

Kroll Archives are in a format substantially similar to defen-

dant's own back-up tapes and restoring them involves a comparable

amount of time and expense (Hanley Dep. at 50-51 (noting that the

Kroll Archives are back-up tapes and would be cheaper to restore

only because there are fewer tapes in the Kroll Archives). While

it is true that Bigelow and Hanley omitted the cost of restoring

and contents[9] of the Kroll Archives from their affidavits, the

omission is immaterial.[10]

---

[9]Although in his affidavit Hanley states that the Kroll
Archives were derived from back-up tapes from 2002, he does not
specify how many of the 2002 tapes were restored and then re-
compressed for the archives or if they limited which tapes they
selected for restoration in some other way (Hanley Aff. at ¶ 12
n.3).

[10]Plaintiff argues that once defendant became aware of
plaintiff's potential claim, it had a duty to preserve evidence
relating to the claim and that it violated this duty by re-
converting the Kroll Archives from an accessible to an
inaccessible format (Pl. Memo. at 7 n.6, 9; Pl. Reply at 3, 9-
10). In addition, plaintiff speculates, but offers no evidence,
that defendant may have deleted some e-mails in violation of
defendant's duty to retain evidence and it's own retention policy
(Pl. Reply at 9-10). Plaintiff fails to cite, and I am unaware
of any case, that states that the duty to preserve electronic
data includes a duty to keep the data in an accessible format.
The cases plaintiff cites speak to the general proposition that a
defendant has a duty to preserve evidence, but do not state that
the evidence must be kept in a particular form. See Shaffer v.
RWP Group, Inc., 169 F.R.D. 19, 24-25 (E.D.N.Y. 1996)

(continued...)

23

Finally the fact that defendant is producing e-mails
from the most complete, but most expensive, source is compelling
evidence of defendant's honesty and good faith. Given the fact
that it has not yet been determined whether the cost of producing
the e-mails will be shifted to plaintiff and the "default"
allocation of cost is against the producing party, it would make
little sense to proffer the back-up tapes as the source for the
e-mails if the e-mails were available in a more accessible form.
Defendant estimates that it will spend close to $500,000 produc-
ing e-mails from back-up tapes (Groman Aff. ¶ 7); the bulk of
that cost is attributable to restoring the e-mails from back-up
tapes into an accessible format (Hanley Aff. ¶ 13). If the data
was readily available, it would be irrational for defendant not

¹⁰(...continued)
(sanctioning party for destroying evidence that it should have
retained in anticipation of litigation); Sheete v. McKinsey &
Co., 91 Civ. 8093 (PKL), 1993 WL 256659 at *4 (S.D.N.Y. July 7,
1993) (same); Turner v. Hudson Transit Line, Inc., 142 F.R.D. 68,
73-74 (S.D.N.Y. 1991) (same); see also Zubulake v. UBS Warburg,
LLC, 220 F.R.D. 212, 218-19 (S.D.N.Y. 2003) (sanctioning
defendant for failing to preserve back-up tapes in anticipation
of litigation, not for failing to keep the data on those tapes in
an accessible form). Based on this, I decline to sanction
defendant for converting data from an accessible to inaccessible
format, even if they should have anticipated litigation. Since
plaintiff offers no evidence of the loss of e-mails, there is no
basis to find that defendant destroyed or purged any e-mails.

to access that source.[11]  Accordingly, I find that there are no
deficiencies in the Bigelow and Hanley affidavits.

2. Sanctions Are Inappropriate
   Under Rules 26(g)(3) and
   37(b)(2) and 28 U.S.C. § 1927

a. Rule 26(g)(3)

Plaintiff claims that MWE certified that the Bigelow
and Hanley affidavits were complete and correct by signing a
cover letter accompanying the affidavits and that a "reasonable
inquiry" into the underlying facts would have revealed that they
were inaccurate and made for the improper purpose of causing
unnecessary delay or needlessly increasing the costs of litiga-
tion (Pl. Memo. at 15).  Therefore, plaintiff argues, MWE should
be sanctioned under Rule 26(g)(3).

The cover letter and affidavits were sent to plaintiff
and the Court.  At the outset, it is not clear that by signing
the cover letter MWE made any certification or that the affida-
vits were even a "response," as the term is used in Rule
26(g)(2).  However, I need not decide the motion on this ground.

---

[11]Defendant has moved to shift its costs for electronic
discovery to plaintiff.  Assuming for the purposes of the
sanctions motion that defendant's cost-shifting motion is
granted, defendant will likely have only a portion of the fees
shifted to plaintiff.  Thus, even under this best-case scenario
for defendant, defendant will still be paying tens, if not
hundreds, of thousands of dollars to restore the back-up tapes.

I find that even if the signature on the cover letter constitutes

a certification, MWE should not be sanctioned for submitting the

affidavits to cause unnecessary delay or needless increases in

ligations costs because the information in the affidavits was

accurate and responsive to my Order.  Because the affidavits were

correct and not misleading, there is no basis to find that MWE

submitted them for an improper purpose.  Therefore, I decline to

impose sanctions under Rule 26(g)(3).

### b.   Rule 37(b)(2)

Plaintiff next claims that the Bigelow and Hanley

affidavits  did not comply with my June 22, 2005 Order and that

defendant and MWE should therefore be sanctioned under Rule

37(b)(2) for not complying with an order to provide discovery.  I

find that the affidavits sufficiently complied with my Order and

that sanctions are not warranted.

My June 22, 2005 Order directed defendant to

> provide counsel for plaintiff with an affidavit
> addressing the technical issues raised by plaintiff's
> discovery requests for e-mails and other electronic
> communications.  The affidavit should address the
> issues discussed by Judge Scheindlin in <u>Zubulake v. UBS
> Warburg LLC</u>, 217 F.R.D. 309 (S.D.N.Y. 2003), in partic-
> ular, the devices used to store data, <u>see</u> 217 F.R.D. at
> 318-19, and the seven factors identified by Judge
> Scheindlin at 217 F.R.D. at 332.

Plaintiff claims that the affidavits failed to disclose

the existence of relevant e-mails on the Database and Kroll

26

Archives (Pl. Memo. at 17). Plaintiff also claims that the affidavits violated my Order by not addressing all seven factors listed by Judge Scheindlin in Zubulake,[12] specifically the availability of information from other sources and the total cost of production (Pl. Memo. at 17; Pl. Reply at 3). In his affidavit, Bigelow focused on the back-up tapes and did not state how many e-mails were on the Database or the cost of searching the Database. However, this omission was harmless under the circumstances. Because the Database contains only a fraction of the e-mail accounts plaintiff seeks to have searched and the e-mail accounts that are on the Database are unlikely to contain as

---

[12]The seven factors are:

> 1. The extent to which the request is specifically tailored to discover relevant information;
>
> 2. The availability of such information from other sources;
>
> 3. The total cost of production, compared to the amount in controversy;
>
> 4. The total cost of production, compared to the resources available to each party;
>
> 5. The relative ability of each party to control costs and its incentive to do so;
>
> 6. The importance of the issues at stake in the litigation; and
>
> 7. The relative benefits to the parties of obtaining the information.

Zubulake v. UBS Warburg, LLC, supra, 217 F.R.D. at 322.

27

complete a set of e-mails as the back-up tapes, there was no reason for defendant's affidavits to disclose the few e-mails available on the Database or the cost of searching it. Despite the presence of some e-mails on the Database, defendant knew the Database's limitations would require it to search the back-up tapes to comply with discovery. Because they were already searching the back-up tapes, which contain more relevant information than the Database, it would be superfluous to require defendant to expend money and resources searching the Database and wrong to sanction them for failing to fully disclose such an inadequate source.[13]

---

[13]Although it might be argued that the affidavits did not technically comply with my Order because they did not address the contents of the Database or cost of searching it, I decline to impose sanctions based on such a technicality. Even if there was a technical violation of my Order by omitting details about the Database, that omission had no bearing on discovery because the Database contains so few of the e-mails plaintiff has requested. Sanctions should not be imposed for such technical, inconsequential violations. See Gen. Signal Co. v. Donallco, Inc., 787 F.2d 1376, 1379 (9th Cir. 1986) ("If a violating party has taken 'all reasonable steps' to comply with the court order, technical or inadvertent violations of the order will not support a finding of civil contempt." (citations omitted)); Panix Promotions, Ltd. v. Lewis, 01 Civ. 2709 (HB), 2004 WL 421937 at *5 (S.D.N.Y. Mar. 5, 2004) (holding party should not be held in contempt for technical violation of the "letter" of an order that did not violate the "spirit" of the order because the violation advantaged the party enforcing the order); Titra Cal, Inc. v. Titra Film, 98 Civ. 0234 (KMW)(FM), 2001 WL 1382587 at *5 (S.D.N.Y. Nov. 6, 2001) ("[I]t is the spirit of the order, not the letter, that must be obeyed."), citing, inter alia, John B. Stetson Co. v. Stephen L. Stetson Co., 128 F.2d 981, 983 (2d Cir. 1942).

28

Plaintiff also claims that the affidavits should have disclosed whatever data was present on the Kroll Archives. As noted above, the Kroll Archives are stored in a substantially similar format to WestLB's back-up tapes and require comparable time and expense to extract e-mails. Once again, the existence of the Kroll Archives had little or no bearing on the costs of discovery or the process of retrieving e-mails because they are so similar to defendant's own back-up tapes. Omitting them was, again, at most a hyper-technical violation of my Order that does not warrant sanctions.

Because defendant and MWE properly focused on the back-up tapes and disclosed the alternative data storage media to a reasonable extent considering the media's limitations, I find that the affidavits complied with my Order, were not misleading and were not produced to cause delay or needless litigation costs. Therefore, I refuse to impose sanctions against defendant or MWE under Rule 37(b)(2).

### c. 28 U.S.C. § 1927

Plaintiff lastly claims that sanctions should be imposed against MWE under § 1927 because their "misleading statements and omissions have unnecessarily delayed this litigation by prolonging WestLB's production of relevant e-mails" (Pl. Memo. at 18). As discussed, MWE has not made misleading state-

29

ments or omissions and have not delayed discovery. Moreover, it cannot credibly be claimed that the alleged defects in the Bigelow and Hanley affidavits resulted in depositions that should have been unnecessary. In almost all cases involving electronically stored documents, it has become almost standard practice for a party seeking discovery to depose an information technology specialist employed by the producing party. I am certain that plaintiff would have deposed Bigelow and Hanley even if their affidavits had contained the information that plaintiff claims was improperly omitted.

IV.  Conclusion

          For the foregoing reasons, plaintiff's motion for sanctions against defendant and MWE under the Federal Rules of Civil Procedure 26(g)(3), 37(b)(2) and 37(c)(1), 28 U.S.C. § 1927 and the inherent powers of the court is denied.

Dated:    New York, New York
          December 15, 2005

                         SO ORDERED

                         HENRY PITMAN
                         United States Magistrate Judge

30

Copies mailed to:

Kathleen Peratis, Esq.
Carmelyn P. Malalis, Esq.
Outten & Golden LLP
3 Park Avenue, 29th Floor
New York, New York 10016

Joel E. Cohen, Esq.
Dawn Groman, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza
New York, New York 10020