```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

CLAUDIA QUINBY,                        :

              Plaintiff,               :      04 Civ. 7406 (WHP)(HBP)

     -against-                         :      OPINION
                                              AND ORDER
WESTLB AG,                             :

              Defendant.               :

----------------------------------X
```

PITMAN, United States Magistrate Judge:

## I.   Introduction

Defendant moves to shift to plaintiff the cost of producing certain documents maintained in electronic form. Specifically, defendant seeks to shift to plaintiff the costs associated with restoring backup tapes and searching the e-mails of six of its former employees. For the reasons set forth below defendant's motion is granted with respect to shifting 30% of the costs of restoring and searching the e-mails of one of the former employees and is denied in all other respects.

II.   Facts

    A.   Plaintiff's Employment
       at WestLB and Her
       Discrimination Claims

      This is an employment discrimination action in which plaintiff alleges, in principal part, gender discrimination in violation of Title VII and retaliatory firing after she complained of the discrimination (Complaint ("Compl.") ¶ 1).

      Plaintiff was an Associate Director/Vice President and later a Director in the Equity Markets Group of WestLB Panmure Securities, Inc. ("WPSI"), a division of WestLB, from May 1999 to June 2003 and again from September 2003 to April 2004 (Compl. ¶¶ 9, 14(a), 44, 48, 57).  She was part of a six-person sales desk consisting of her supervisor, John Parker, three other males and one other female (Compl. ¶ 10).

      Parker was the individual primarily responsible for the alleged discrimination.  As supervisor, he made many of the compensation and firing decisions concerning the group's employees (7/5/05 Tr.[1] at 47; 7/7/05 Tr. at 79, 128-29), though he often had to obtain his superiors' approval before implementing his decisions (Defendant's Response Letter to EEOC Charge ("Def. EEOC Resp.") at 7-8, annexed as Exhibit 4 to Declaration of

---

    [1]"Tr." refers to the transcripts of the discovery conferences held before me on the date indicated.

Carmelyn P. Malalis, Esq., dated December 2, 2005 ("Malalis Decl.") (Docket Item 69); 7/5/05 Tr. at 47; 7/7/05 Tr. at 129).

Over the course of her employment plaintiff noticed that women were treated differently than men.  For example, plaintiff alleges that she and other women were "excluded from the office communications loop" and were not invited to business-related dinners and after-hours social activities (Compl. ¶ 15(a)).  Furthermore, Parker and the other men in the group would often make offensive or demeaning comments and jokes about women and would sometimes announce that a client or colleague needed to be "bitch slapped" (Compl. ¶ 15(c)).

Plaintiff also alleges that she received lower pay than males on the sales desk.  In March of 2000 and 2001, she earned bonuses of $475,000 and $575,000, respectively (Compl. ¶ 14).  However, in March 2002, plaintiff's bonus was reduced to $100,000 (Compl. ¶ 23).  Although other employees' bonuses were also reduced that year, plaintiff claims that her bonus was reduced substantially more than the bonuses of similarly situated male employees (Compl. ¶ 30).

In October 2002, plaintiff alleges that WestLB made "secret bonus payment[s]" to male members of her sales desk (Compl. ¶ 30).  In November 2002, "because of the bonus issue, as well as continuing discriminatory treatment in her daily working conditions," plaintiff filed a formal grievance complaining of

gender discrimination with the then-director of human resources at WestLB, Betsy Austin (Compl. ¶¶ 27, 32; September 28, 2005 Deposition of Betsy Austin ("Austin Dep.") at 22, annexed as Exhibit 14 to Declaration of Tammy Marzigliano, Esq., dated October 3, 2005 ("Marzigliano Decl.") (Docket Item 42)).  Plaintiff made several more complaints to Austin "about gender discrimination in the [g]roup" in early 2003 (Compl. ¶ 33).

In March 2003, the parties reached a settlement under which plaintiff received a $250,000 "bonus" in exchange for releasing all claims against defendant for acts occurring prior to 2003 (Compl. ¶ 34; Equal Employment Opportunity Commission Notice of Charge of Discrimination ("EEOC Charge") ¶ 4, annexed as Exhibit 15 to Marzigliano Decl.; Def. EEOC Resp. at 9).  Throughout 2003, however, plaintiff alleges that the discriminatory environment in her department continued, and that, among other things, Parker continued to exclude plaintiff from meetings and discussions and to direct praise and positive reinforcement solely to male salespersons (Compl. ¶ 35).

In early 2003, WestLB began planning a workforce reduction (Def. EEOC Resp. at 9).  On May 9, 2003, Parker informed plaintiff that she would soon be terminated because a workforce reduction had been mandated by senior management and plaintiff's "skill set" was no longer compatible with WestLB's new business plan (Compl. ¶ 38).  Plaintiff, however, alleges

that at approximately this same time, Parker was interviewing male candidates to fill plaintiff's position (Compl. ¶ 40).

Plaintiff continued to work at WestLB through early June 2003 (Compl. ¶ 41).  On June 6, 2003, she made an appointment to meet with Moses Dodo, the head of WestLB North America, to discuss the terms of a severance package plaintiff had proposed (Compl. ¶ 43).  On June 8, 2003, however, prior to her scheduled meeting with Dodo, Austin telephoned plaintiff at home and stated that plaintiff was terminated and should not return to the office (Compl. ¶ 44).  Two other people on the sales desk also resigned at this time, leaving no senior salespeople, such as plaintiff, at the desk (Compl. ¶ 47).  On June 12, 2003, sales desk personnel received their bonuses for fiscal year 2002. Plaintiff did not receive a bonus (Compl. ¶ 45).

On July 17, 2003, plaintiff filed a charge with the EEOC against defendant claiming gender discrimination (Compl. ¶ 46).[2]

In September 2003, plaintiff was fully reinstated to her former position at WestLB (Compl. ¶ 48).  Two other senior salesmen were also hired at approximately this time, resulting in the sales desk having the same number of senior salespeople employed as before the workforce reduction (Compl. ¶ 49).

---

[2]The charge is discussed more fully below.

After her return, one of plaintiff's most lucrative accounts was assigned to a male employee who had not previously covered the account (Compl. ¶ 51).  By January 2004, Parker had criticized plaintiff's performance on several occasions and plaintiff responded, in writing, that she was being held to more stringent standards than male employees (Compl. ¶ 52).  On March 9, 2004, Parker advised plaintiff that she would receive no bonus for 2003 because the bank had had a poor financial year (Compl. ¶ 53).  Plaintiff alleges that every other employee in her department received a bonus, including the two new male employees (Compl. ¶ 53).  Plaintiff filed an internal grievance regarding her bonus with Phil Feurstein, an employee in the human resources department, who dismissed the complaint (Compl. ¶ 54; E-mail from Philip Feurstein to Claudia Quinby, dated March 31, 2004 ("Feurstein E-mail"), annexed as Exhibit 5 to Malalis Decl.).

On April 8, 2004, plaintiff filed an amended charge with the EEOC, claiming that defendant's failure to pay her a bonus was retaliatory (Compl. ¶ 56).

On April 16, 2004, defendant again terminated plaintiff's employment (Compl. ¶ 57).  Soon thereafter, plaintiff filed a second amended charge with the EEOC, claiming that her firing was retaliatory (Compl. ¶ 60).

2.   The Initial EEOC Charge
      and Defendant's Response

Plaintiff's initial charge to the EEOC, dated July 17, 2003, contained many of the allegations in the complaint that are set forth above and does not require repeating.  In summary, the charge claims that plaintiff's department at WestLB was "permeated by gender discrimination," that women were left out of "the communication loop," that only male employees received regular praise, that demeaning comments and jokes about women were commonplace and that plaintiff received a lower bonus than similarly situated male employees (EEOC Charge ¶¶ 3-4).

On January 23, 2004, defendant responded to the initial EEOC charge.  There, defendant claimed that plaintiff was initially terminated because there was a plan to reduce the workforce and restructure her department.  Defendant further claimed that plaintiff was selected for termination because Parker conducted a "skills assessment" of the employees on the desk, and plaintiff's "skill set was the least compatible with [WestLB's] new business strategy" (Def. EEOC Resp. at 9-10).[3]

---

[3] Defendant's responses to plaintiff's amended and second amended charges have not been submitted in connection with this motion.

7

3.   <u>The Electronic Discovery Dispute</u>

The instant motion arises out of plaintiff's First Request for Production of Documents (the "Document Request"), served on February 18, 2005 (Defendant's Memorandum of Law in Support of its Motion to Shift the Cost of the Production of Electronic Discovery ("Def. Memo.") (Docket Item 32) at 1). There, plaintiff requested that nineteen current and former WestLB employees' e-mail accounts be searched for certain terms alleged to refer to plaintiff in particular or that are potentially sexist in general.  The Document Request also sought e-mails relating to discrimination against other women at WestLB and e-mails showing that men were more highly compensated than women (Plaintiff's First Request for Production of Documents ("Document Request") ¶¶ 7, 10-21, 25-26, 31-32, annexed as Exhibit A to Affidavit of Terri L. Ross, Esq., sworn to September 12, 2005 ("Ross Aff.") (Docket Item 33)).  The Document Request did not limit most of the requests to any particular period of time.

Defendant objected to many of the requests for electronic discovery claiming they were overly broad and would result in undue burden.  The parties were unable to agree on the scope of electronic discovery and sought my intervention to resolve the dispute (Affidavit of Dawn J. Darringer, Esq., sworn to October 18, 2005 ("Darringer Aff.") ¶¶ 2, 5 (Docket Item 46)).

8

At the subsequent discovery conferences before me, plaintiff claimed that she wanted to search nineteen current and former WestLB employees' e-mails for over 170 search terms for approximately a five year period (7/5/05 Tr. at 35, 57-58; "Proposed Search Terms," annexed to Facsimile from Kathleen Peratis, Esq., to Chambers, dated July 5, 2005 ("Proposed Search Terms")).  Some of the proposed search terms were words that are very commonly used in the investment banking industry, such as "asset," "deal," "insurance" and "risk" (Proposed Search Terms).  Still others were even more commonly used words that could be present in practically any e-mail, including words such as "go," "her," "okay" and "she" (Proposed Search Terms).

After several discovery conferences, I limited the Document Request with respect to e-mails to searches of seventeen[4] current and former WestLB employees, utilizing individualized search terms for each employee; the search terms used ranged from 3 to 15 terms for any given employee (7/7/05 Tr. at 105, 116; 7/12/05 Tr. at 6, 68).  For some requests I also limited the period of time to be searched (e.g., 7/12/05 Tr. at 53).

---

[4]As discussed below, the parties debate how many employees' e-mails were ordered searched.

Defendant claims that in order to produce many of these e-mails, it had to restore and search backup tapes[5] (Darringer Aff. ¶ 5).  Data stored on defendant's backup tapes is in an inaccessible, compressed format, and restoring the data to a readily-accessible format takes substantial amounts of time and results in significant expense (Affidavit of Stuart Hanley, sworn to June 27, 2005 ("Hanley Aff.") ¶¶ 8-12, annexed as Exhibit C to Ross Aff.).[6]

_____

[5]For a thorough discussion of the various methods by which WestLB stores e-mails and an explanation as to why defendant produced the e-mails from backup tapes, see Quinby v. WestLB AG, 04 Civ. 7406 (WHP)(HBP), 2005 WL 3453908 at *6-*9 (S.D.N.Y. Dec. 15, 2006) ("Quinby I").

[6]Backup tapes are produced by

> [a] device, like a tape recorder, that reads data from and writes it onto a tape.  Tape drives have data capacities of anywhere from a few hundred kilobytes to several gigabytes.  Their transfer speeds also vary considerably . . . [.]  The disadvantage of tape drives is that they are sequential-access devices, which means that to read any particular block of data, you need to read all the preceding blocks.  As a result, [t]he data on a backup tape are not organized for retrieval of individual documents or files [because] . . . the organization of the data mirrors the computer's structure, not the human records management structure. Backup tapes also typically employ some sort of data compression, permitting more data to be stored on each tape, but also making restoration more time-consuming and expensive, especially given the lack of uniform standard governing data compression.

Zubulake v. UBS Warburg, LLC, 217 F.R.D. 309, 319 (S.D.N.Y. 2003) ("Zubulake I") (internal quotes and footnotes omitted).  Backup tapes are considered an inaccessible format and not readily usable.  Data stored on backup tapes becomes usable when
(continued...)

When an employee leaves WestLB, it is WestLB's practice to delete the employee's e-mails from its accessible database and maintain them solely on backup tapes (Darringer Aff. ¶ 17; Supplemental Affidavit of Kenneth Bigelow, sworn to July 23, 2005 ("Bigelow Supp. Aff.") ¶¶ 4 n.1, 6, annexed as Exhibit E to Ross Aff.).  Of the seventeen individuals whose e-mails WestLB was directed to search, eight are former employees (Darringer Aff. ¶ 18).  WestLB converted the e-mails of six of the eight former employees -- Austin, Miguel Barron, Feurstein, Graham, Richard James and Patrick Oddoux (collectively the "Former Employees") -- into inaccessible formats (Darringer Aff. ¶ 18).  WestLB retained e-mails from the other two -- plaintiff herself and Parker -- on its accessible database (Darringer Aff. ¶ 18).  Defendant is seeking to shift to plaintiff the costs of restoring and searching backup tapes containing the e-mails of only the six Former Employees (Darringer Aff. ¶ 18; Defendant's Reply Brief in Support of Its Motion to Shift the Costs of the Production of Electronic Discovery ("Def. Reply") (Docket Item 46) at 5).

Of the six Former Employees, three -- Barron, Oddoux and James -- were plaintiff's co-workers at the sales desk

---

[6](...continued)
fragmented data contained on the tapes is unfragmented and erased data is reconstructed.  <u>Zubulake I</u>, <u>supra</u>, 217 F.R.D. at 319-20.

(7/7/05 Tr. at 58-59, 73, 105; 7/12/05 Tr. at 20).[7]  Barron left WestLB in November 2002 (7/7/05 Tr. at 58), Oddoux in August 2003 (7/7/05 Tr. at 105), and James in September 2003 (7/7/05 Tr. at 73).  Searches of their e-mails were limited to the terms "Claudia," "Quinby" and "CQ" (7/12/05 Tr. at 6).

As noted above, two of the Former Employees, Austin and Feurstein, worked in the human resources department and were the recipients of several of plaintiff's complaints of discrimination.  They also played a role in determining WestLB's response to plaintiff's complaints (Malalis 13;[8] Malalis 25; Malalis 27; Malalis 31; Malalis 39; Feurstein E-mail).  Austin left WestLB in December 2003 (Austin Dep. at 9).  The search terms for all of her e-mails were "Claudia," "Quinby," "CQ," "Eileen," "McPeek" and "E.M." (7/12/05 Tr. at 27).  Additional search terms for Austin were also ordered, but those searches were to be limited to e-mails sent to or received from employees of WPSI; the terms used were "axe," "bonus," "fire," "headcount," "pay," "complain," "retention" and "business reason," assuming it

---

[7]Since the parties' briefs and affidavits do not address the roles that the Former Employees played in this litigation, I rely on representations by counsel concerning these matters made before me at the discovery conferences.

[8]"Malalis" followed by a number refers to e-mails submitted by plaintiff that plaintiff designates in the same manner.  The e-mails are annexed collectively as Exhibit 2 to the Malalis Supplemental Declaration.

was technologically possible to search for "business reason" (7/7/05 Tr. at 78; 7/12/05 Tr. at 22, 27).

As for Feurstein, he left the bank in November 2004 (July 14, 2005 Deposition of Philip H. Feurstein at 7, annexed as Exhibit 18 to Marzigliano Decl.). Searches of his e-mails were limited to a set time period, from November 24, 2003 to November 12, 2004, and the search terms were "Claudia," "Quinby" and "CQ" (7/7/05 Tr. at 65; 7/12/05 Tr. at 6).

The final Former Employee, Graham, the head of the Equity Markets Group and Parker's supervisor, made many of the decisions regarding employee compensation and firings (Def. EEOC Resp. at 7-8; 7/5/05 Tr. at 47; 7/7/05 Tr. at 129). For example, in early 2002, Graham supervised a review of all of the employees in the Equity Markets Group and determined what their bonuses would be for the previous year. He also met with plaintiff on at least one occasion in late 2001 to discuss her annual evaluations (Def. EEOC Resp. at 7-8).

Graham left WestLB on March 31, 2003 (Letter from Claire Mathews to Dawn Groman, Esq., dated Oct. 14, 2005, annexed as Exhibit 6 to Darringer Aff.). Although Graham was discussed at the discovery conferences, due to the oversight of counsel and myself, there was never an order either compelling production of his e-mails or protecting them from being produced.

13

In order to restore and search the backup tapes, defendant retained an outside consultant, Kroll Ontrack ("Kroll"). Because Kroll had worked with WestLB on past projects, it was familiar with WestLB's electronic systems and storage (Hanley Aff. ¶ 12 & n.3). Over the course of one of these projects Kroll created what the parties refer to as the "Kroll Archives," which are backup tapes maintained by Kroll that contain WestLB data (Hanley Aff. ¶ 12 n.3). Restoring these tapes is slightly cheaper than restoring WestLB's own backup tapes. See Quinby I, supra, 2005 WL 3453908 at *8.

In producing the Former Employees' e-mails, Kroll restored and searched (1) 171 backup tapes for 2003 and 2004; (2) the Kroll Archives, and (3) backup tapes for employees who worked outside the United States (Second Supplemental Affidavit of Lori Carey, sworn to November 17, 2005 ¶ 8 ("Carey 2d Supp. Aff.") (Docket Item 67)). In addition to searching each Former Employee's files for responsive e-mails, Kroll also searched hard drives shared among employees within the two departments that the Former Employees worked in, i.e., human resources (also referred to as "HR") and WPSI, since these drives included additional files of the Former Employees (Carey 2d Supp. Aff. ¶ 9; Defendant's Supplemental Memorandum of Law in Further Support of Its Motion to Shift the Cost of the Production of Electronic Discovery ("Def. Supp. Memo.") (Docket Item 65) at 5). This

process yielded 59,635 original, i.e. non-duplicate, documents consisting of 401,420 pages.  By contrast, defendant claims it produced only 9,622 documents, or 141,702 pages, from accessible sources (Carey 2d Supp. Aff. ¶ 7).

Kroll charged defendant $181,013.28 to restore and search these backup tapes, including the backup tapes that make up the Kroll Archives (Carey 2d Supp. Aff. ¶¶ 8-9).  Defendant has not explained whether this is the cost of the entire document production from inaccessible sources or whether it relates only to producing those backup tapes containing the Former Employees' e-mails.  Kroll also charged defendant a 25% premium for expediting the project -- a cost defendant also seeks to shift -- bringing the total to $226,266.60 (Carey 2d Supp. Aff. ¶ 11).  Additionally, defendant seeks to shift the cost of re-producing some files into a different format after plaintiff complained that they were produced in a ".tif"[9] format instead of the previously agreed-to format, ".dii"[10] (Def. Reply at 3-4).  Kroll

--------

[9]".tif" or "Tagged Image Format" is a commonly used electronic format for digitized pictures of documents.  It is often used to produce e-mails for loading onto Summation, a software program designed to assist attorneys in searching, organizing and analyzing documents (Affidavit of David Manber, sworn to September 30, 2005 ("Manber Aff.") at ¶¶ 4, 7 n.1, annexed as Exhibit 9 to Marzigliano Decl.).

[10]".dii" is a format which facilitates the loading of files onto Summation and may be created from .tif files (Manber Aff. ¶ 7 n.2; Carey 2d Supp. Aff. ¶ 7).

charged defendant $5,413.76 to re-produce these files in the .dii format (Carey 2d Supp. Aff. ¶ 10).

III.  <u>Analysis</u>

    A.  <u>Applicable Legal Principles</u>

        Rule 26(b) of the Federal Rules of Civil Procedure states that parties may "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party," except where, <u>inter</u> <u>alia</u>, "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."

        There is a presumption that "the responding party must bear the expense of complying with discovery requests." <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340, 358 (1978). However, under Rule 26(c), a district court may issue an order protecting the responding party from undue burden or expense by "conditioning discovery on the requesting party's payment of the costs of discovery." <u>Oppenheimer Fund, Inc. v. Sanders</u>, <u>supra</u>, 437 U.S. at 358; <u>see</u> <u>Zubulake v. UBS Warburg LLC</u>, 216 F.R.D. 280, 283 (S.D.N.Y. 2003) ("<u>Zubulake III</u>").  Such an order may be granted only on the motion of the responding party and "for good

cause shown."  Fed.R.Civ.P. 26(c).  Further, "the responding party has the burden of proof on a motion for cost-shifting." Zubulake III, supra, 216 F.R.D. at 283; see also Wiginton v. CB Richard Ellis, Inc., 229 F.R.D. 568, 573 (N.D. Ill. 2004).

In Zubulake I, supra, 217 F.R.D. at 322, the Honorable Shira A. Scheindlin, United States District Judge, set forth an analytical framework for determining whether it is appropriate to shift the costs of electronic discovery.  Like the plaintiff in this case, the plaintiff in Zubulake was a highly-paid investment banker who accused her employer of gender discrimination and illegal retaliation.  Zubulake claimed that key evidence was located in e-mails that were contained only in backup tapes and sought an order compelling the defendant, UBS Warburg LLC ("UBS"), to produce the e-mails at its own expense.  Zubulake I, supra, 217 F.R.D. at 311-12.  After UBS was ordered to produce the e-mails, Judge Scheindlin considered whether cost-shifting was merited.  Zubulake I, supra, 217 F.R.D. at 317.

As a threshold matter, Judge Scheindlin stated that "cost-shifting should be considered only when electronic discovery imposes an 'undue burden or expense' on the responding party."  Zubulake I, supra, 217 F.R.D. at 318 (emphasis omitted), quoting Fed.R.Civ.P. 26(c).  "[W]hether production of documents is unduly burdensome or expensive turns primarily on whether it is kept in an accessible or inaccessible format (a distinction

that corresponds closely to the expense of production)."
Zubulake I, supra, 217 F.R.D. at 318 (emphasis omitted).  Data
that is "accessible" is stored in a readily usable format that
"does need to be restored or otherwise manipulated to be usable."
Zubulake I, supra, 217 F.R.D. at 320.  Conversely, data that is
"inaccessible" is not readily useable and must be restored to an
accessible state before the data is usable.  Zubalake I, supra,
217 F.R.D. at 320.  Backup tapes are considered an inaccessible
format, and, thus, shifting the costs of producing data from
backup tapes may be considered.  Zubulake I, supra, 217 F.R.D. at
320.

        If the responding party is producing data from
inaccessible sources, Judge Scheindlin identified seven factors
-- a slight modification of the eight-factor test first
promulgated by the Honorable James C. Francis IV, United States
Magistrate Judge, in Rowe Entertainment, Inc. v. William Morris
Agency, Inc., 205 F.R.D. 421, 428-32 (S.D.N.Y. 2002) -- to be
considered in determining whether shifting the cost of production
is appropriate:

> 1.  The extent to which the request is specifically tailored to discover relevant information;
>
> 2.  The availability of such information from other sources;
>
> 3.  The total costs of production, compared to the amount in controversy;

4.  The total costs of production, compared to the resources available to each party;

5.  The relative ability of each party to control costs and its incentive to do so;

6.  The importance of the issues at stake in the litigation; and

7.  The relative benefits to the parties of obtaining the information.

Zubulake I, supra, 217 F.R.D. at 322.  Judge Scheindlin weighed the factors in descending order, the first factor being the most important consideration and the seventh factor the least important.  Zubulake I, supra, 217 F.R.D. at 323.

To determine whether cost-shifting was appropriate in Zubulake, Judge Scheindlin looked to a sample in which defendant restored data from 5 out of 72 backup tapes which contained the e-mails from Zubulake's immediate supervisor, the alleged principal perpetrator of the discrimination, over a five-month period.  Zubulake III, supra, 216 F.R.D. at 282.  The restoration yielded a total of 8,344 e-mails including duplicates.  Searching the e-mails for the terms "Laura," "Zubulake" and "LZ" yielded 1,075 non-duplicate e-mails of which UBS determined 600 were responsive to Zubulake's document request.  Zubulake III, supra, 216 F.R.D. at 282.

In applying the analysis set forth above, Judge Scheindlin found that UBS was entitled to shift to plaintiff 25%

of the costs of producing the e-mails.  <u>Zubulake III</u>, <u>supra</u>, 216

F.R.D. at 289.

    B.  The Appropriateness of Cost-
       <u>Shifting Appropriate Here</u>

       The initial question to be resolved is whether it is

appropriate to shift the costs of electronic document production

in this case.  Defendant is only seeking to shift the costs it

incurred in restoring and searching backup tapes and the Kroll

Archives.[11]  Although, as discussed above, cost-shifting may be

considered concerning the restoration and search of backup tapes

because the process is burdensome and costly, the appropriateness

of cost-shifting is less clear here because it appears that

defendant converted the Former Employees' e-mails into an

inaccessible format after it should have anticipated this

_____

    [11]Plaintiff claims that cost shifting is inappropriate
because defendant was never ordered to produce backup tapes
(Plaintiff's Memorandum of Law in Opposition to Defendant's
Motion to Shift the Costs of the Production of Electronic
Discovery ("Pl. Memo.") (Docket Item 41) at 6).  This is clearly
incorrect as the backup tapes are the only source of certain
individuals' e-mails and, since defendant was ordered to produce
those e-mails, it was required to restore backup tapes.  <u>See</u>
<u>Quinby I</u>, <u>supra</u>, 2005 WL 3453908 at *7.  Similarly, although
plaintiff acknowledges that defendant appropriately produced data
from the Kroll Archives, she claims that the Kroll Archives are
on an accessible media (Plaintiff's Supplemental Memorandum of
Law in Opposition to Defendant's Motion to Shift the Cost of the
Production of Electronic Discovery ("Pl. Supp. Memo.") (Docket
Item 68) at 6).  It is indisputable, however, that the Kroll
Archives are not on accessible media.  <u>See</u> <u>Quinby I</u>, <u>supra</u>, 2005
WL 3453908 at *8.

litigation.  Plaintiff argues that cost-shifting is inappropriate because defendant, pursuant to its obligation to preserve evidence, was required to maintain the Former Employees' e-mails in an accessible format (Pl. Memo. at 17).  Defendant argues that it satisfied its duty to preserve the e-mails by maintaining them on backup tapes (Def. Reply at 6).

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001), citing Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998).

In Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) ("Zubulake IV"), Judge Scheindlin discussed the scope of this duty:

> Must a corporation, upon recognizing the threat of litigation, preserve every shred of paper, every e-mail or electronic document, and every backup tape?  The answer is clearly, "no[.]"  Such a rule would cripple large corporations, like [defendant], that are almost always involved in litigation. . . .
>
> At the same time, anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary.  While a litigant is under no duty to keep or retain every document in its possession . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.

(Footnotes, internal quotation marks and citations omitted).
"Thus, '[o]nce a party reasonably anticipates litigation, it must
suspend its routine document retention/destruction policy and put
in place a "litigation hold" to ensure the preservation of
relevant documents.'" <u>Chan v. Triple 8 Palace, Inc.</u>, 03 Civ.
6048 (GEL)(JCF), 2005 Wl 1925579 at *6 (S.D.N.Y. Aug. 11, 2005),
<u>quoting</u> <u>Zubulake IV</u>, <u>supra</u>, 220 F.R.D. at 218.

The scope of the duty extends to the "key players" in a
litigation, <u>i.e.</u>, "individuals 'likely to have discoverable
information that the disclosing party may use to support its
claims or defenses.'" <u>Zubulake IV</u>, <u>supra</u>, 220 F.R.D. at 218,
<u>quoting</u> Fed.R.Civ.P. 26(a)(1)(A).  Furthermore, "[a] party or
anticipated party must retain all relevant documents (but not
multiple identical copies) in existence at the time the duty to
preserve attaches, and any relevant documents created thereafter.
In recognition of the fact that there are many ways to manage
electronic data, litigants are free to choose how this task is
accomplished." <u>Zubulake IV</u>, <u>supra</u>, 220 F.R.D. at 218.

Questions related to the duty to preserve evidence
generally arise in the context of motions for sanctions based on
alleged spoliation.  Plaintiff's argument here is unique in that
she is not claiming that the e-mails have been lost or destroyed;
instead she is claiming that defendant had a duty to maintain the
e-mails in a particular format and that because defendant

22

violated this duty, it cannot now seek cost-shifting for restoring the e-mails from an inaccessible state (Pl. Memo. at 17).  Defendant argues that the duty to preserve evidence does not require the producing party to maintain electronic data in any particular format (Def. Reply. at 6).

In resolving a sanctions motion in Quinby I, I declined to sanction defendant for converting data from an accessible to an inaccessible format, even assuming that defendant should have anticipated litigation at the time it converted the data.[12]

------

[12]One of my colleagues disagrees with this conclusion. Citing Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 110 (2d Cir. 2002), Judge Francis has found that "permitting the downgrading of data to a less accessible form -- which systematically hinders future discovery by making the recovery of the information more costly and burdensome -- is a violation of the preservation obligation."  Treppel v. Biovail Corp., 233 F.R.D. 363, 372 n.4 (S.D.N.Y. 2006).  I respectfully disagree with my colleague's analysis, and do not read Residential Funding Corp. to stand for this proposition. Residential Funding Corp. addressed the proper standards for giving an adverse inference instruction against a party that failed to produce e-mails sufficiently in advance of trial to permit their use by the adversary.  There, in determining whether the unproduced e-mails were relevant, the Second Circuit found that the responding party's "'purposeful sluggishness'" in responding to the discovery request could support an inference that the e-mails were likely harmful to the responsive party. Residential Funding Corp. v. DeGeorge Fin. Corp., supra, 306 F.3d at 110.  The Second Circuit did not hold that sanctions were appropriate for downgrading into an inaccessible format electronic evidence that was subject to a litigation hold.

In addition, if, as Residential Funding implies, any document storage practice that makes the recovery of documents more burdensome constitutes a violation of the preservation obligation, then a whole range of document storage practices, such as off-site storage in "dead" files, microfilming and
(continued...)

Quinby I, supra, 2005 WL 3453908 at *8 n.10.  This conclusion
ensures that in complying with a duty to preserve evidence, a
party will be free to preserve electronic evidence in any format
it chooses, including inaccessible formats.  See Zubulake IV,
supra, 220 F.R.D. at 218 ("In recognition of the fact that there
are many ways to manage electronic data, litigants are free to
choose how this task is accomplished.").  Preservation of data,
even in an inaccessible form, will not result in spoliation
because the responding party will be able to produce the
electronic evidence by restoring it from an inaccessible format,
albeit at a higher cost.[13]

_____

[12](...continued)
digital imaging, would violate the preservation obligation
because these practices also increase the burden of retrieving
documents.  I respectfully submit that construing the
preservation obligation this broadly is inappropriate because it
creates the potential for punishing routine business practices
that do not destroy documents or alter them in any material
sense.

   [13]Converting electronic documents into an inaccessible
format is comparable to a scenario in which a responding party
moves hard copies of documents to an off-site storage facility in
a remote location.  Although retrieving the documents would be
more expensive and take more time than if they had never been
moved, there is no question that there has been no spoliation
since the documents are still retrievable.

   There is a theoretical possibility that storage of documents
on backup tapes may, on rare occasions, result in the documents
becoming truly inaccessible.  This possibility however seems
remote because such an eventuality would defeat the purpose of
maintaining backup tapes.  I submit that this risk is analogous
to the risk that a document warehouse may suffer a fire or flood
and is not a sufficient basis for a blanket rule that equates use
                                            (continued...)

However, the foregoing discussion only addresses whether it is appropriate to impose sanctions and leaves open the question of whether a party that converts its data into an inaccessible format after the duty to preserve evidence has arisen can then seek to shift its costs of restoring the data into an accessible format.

As previously stated, cost-shifting is appropriate only where electronic discovery imposes an undue burden or expense. I submit, however, that if a party creates its own burden or expense by converting into an inaccessible format data that it should have reasonably foreseen would be discoverable material at a time when it should have anticipated litigation, then it should not be entitled to shift the costs of restoring and searching the data. Cf. Zubulake IV, supra, 220 F.R.D. at 216 ("While a litigant is under no duty to keep or retain every document in its possession . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonable likely to be requested during discovery and/or is the subject of a pending discovery request.") (internal quotations marks and citation omitted); Houlihan v. Marriott Int'l, Inc., 00 Civ. 7439 (RCC), 2003 WL 22271206 at *2 (S.D.N.Y. Sept. 30, 2003)

---

[13](...continued)
of backup storage media with the destruction of documents.

(in determining the scope of duty to preserve evidence in the absence of a discovery order, "the critical question is whether the party knew or should have known that the destroyed evidence was relevant" to the litigation).  This would permit parties to maintain data in whatever format they choose, but discourage them from converting evidence to inaccessible formats because the party responsible for the conversion will bear the cost of restoring the data.  Furthermore, it would prevent parties from taking unfair advantage of a self-inflicted burden by shifting part of the costs of undoing the burden to an adversary.

If, on the other hand, it is not reasonably foreseeable that the particular evidence in issue will have to be produced, the responding party who converts the evidence into an inaccessible format after the duty to preserve evidence arose may still seek to shift the costs associated with restoring and searching for relevant evidence.

Plaintiff claims that defendant should have reasonably anticipated this litigation no later than October 2002 when plaintiff filed an internal complaint to defendant alleging sexual discrimination (Pl. Memo. at 14).  Although I agree with plaintiff, in determining the scope of what materials defendant should have reasonably foreseen would be discoverable evidence, plaintiff overlooks the March 2003 settlement in which plaintiff released defendant from all claims arising before December 31,

2002.  Since the settlement did not release defendant from acts committed after December 31, 2002, defendant still should have anticipated litigation at the time the settlement was executed. However, having been released for acts committed before 2003, defendant, under these circumstances, could not have reasonably anticipated that electronic documents created by employees who left WestLB prior to 2003 would be discoverable.

Of the six Former Employees, three of them -- Barron, James and Oddoux -- worked on the sales desk with plaintiff. There are no specific allegations about these individual's behavior towards plaintiff, only general allegations that plaintiff's department was "permeated by gender discrimination," the male salespeople in the group created a discriminatory environment by excluding women from the "office communications loop," after hours meetings and social gatherings and the male salespeople often made offensive or demeaning comments or jokes about women (Compl. ¶ 15; EEOC Charge ¶ 3).

Only one of these three, Barron, left WestLB prior to 2003.  Even assuming Barron participated in these discriminatory activities, he could only have done so prior to December 31, 2002, during the period for which plaintiff released all claims. Although this does not make his e-mails non-discoverable -- they may be admissible as similar act evidence -- defendant could not

have reasonably anticipated that Barron's e-mails would have to be produced.

On the other hand, Oddoux and James, who left WestLB in August and September 2003, respectively, were still employed at a time not covered by the release and were, arguably, similarly situated male employees during the time period in which plaintiff alleged that the male members of her group excluded her and when defendant should have anticipated litigation.  Considering the complaints about the men in plaintiff's group in general and that Oddoux and James were two of the four men working there, it was reasonably foreseeable that their e-mails would be requested in discovery.

Both Austin and Feurstein, who left in December 2003 and November 2004, respectively, worked in WestLB's human resources department, and plaintiff made several gender discrimination complaints to them.  They also played a role in determining WestLB's response to plaintiff's complaints.  Because of their roles in the events culminating in this litigation, it was reasonably foreseeable at the time they left WestLB that defendant would have to produce their e-mails at least to the extent they related to plaintiff.

As for Graham, who left WestLB on March 31, 2003, he sometimes made decisions regarding employee compensation and firings in the Equity Markets Group.  Although he was clearly

involved in determining the amount of plaintiff's bonus in 2002, it is not clear what role, if any, he played with respect to plaintiff from January 1, 2003 until his departure.  However, considering Graham left the bank only eight weeks before plaintiff received the May notification of her pending termination and twelve weeks before she learned that she was not receiving an annual bonus in conjunction with the fact that he was a decision maker with respect to compensation and firings for plaintiff's group, it seems more likely than not that Graham participated in decisions relating to plaintiff's 2003 bonus and termination.  Thus, I find that it was reasonably foreseeable that Graham's e-mails would need to be produced at a time when defendant should have anticipated the litigation.[14]

Because I find that, with the exception of Barron's e-mails, defendant should have reasonably anticipated having to produce all the Former Employees' e-mails, I consider the Zubulake cost-shifting factors with respect to the costs of restoring and searching only Barron's e-mails.

---

[14]In the alternative I could also find that because defendant has not proffered why Graham's e-mails would be irrelevant to this case or available from some other source, defendant has failed to meet its burden with respect to showing why the costs of producing Graham's e-mails should be shifted to plaintiff.

C.   Zubulake Seven Factor Test

    1.   The Marginal Utility Test

    When combined, the first two factors are known as the
"marginal utility test."  Zubulake III, supra, 216 F.R.D. at 284.
This test is described in McPeek v. Ashcroft, 202 F.R.D. 31, 34
(D.D.C. 2001):

> The more likely it is that the backup tape contains
> information that is relevant to a claim or defense, the
> fairer it is that the [responding party] search at its
> own expense.  The less likely it is, the more unjust it
> would be to make the [responding party] search at its
> own expense.  The difference is at the margin.

(Internal quotation marks omitted).

        a.   Factor One:  The Extent
             to Which the Request is
             Specifically Tailored to
             Discover Relevant Information

    As previously stated, the initial document request
sought to have over 170 terms searched in e-mails from nineteen
former and current WestLB employees over an approximately five-
year long period.  Following multiple conferences before me, the
electronic discovery as it pertained to e-mails was limited to
searches of seventeen current and former WestLB employees,
utilizing a limited number of search terms and, in some
instances, more limited time frames.

Plaintiff argues that because the Court engaged in this paring down, that the Document Request, as modified by the Court, was _per se_ specifically tailored to discover relevant information (Pl. Memo. at 21).[15]  I disagree.

A court may limit the scope of discovery under the Federal Rules of Civil Procedure in several ways, including by way of Rule 26(b)(2) which permits the court to limit discovery if the burden or expense of production outweighs its potential benefits, and Rule 26(c) which permits the issuance of protective orders, including by shifting the costs of unduly burdensome or expensive production.  Narrowing plaintiff's document request pursuant to Rule 26(b)(2) does not preclude the Court from also granting a protective order in the form of cost-shifting for those documents that were ordered to be produced.  See Zubulake III, supra, 216 F.R.D. at 283 ("Although 'the presumption is that the responding party must bear the expense of complying with discovery requests,' requests that run afoul of the Rule 26(b)(2) proportionality test may subject the requesting party to protective orders under Rule 26(c), 'including orders

---

[15]Additionally, plaintiff mistakenly argues that defendant should be barred from cost-shifting since defendant was ordered in June 2005 to conduct a sample backup restoration and search and failed to do so (Pl. Memo. at 4, 21; Pl. Supp. Memo. at 7). My Order only required defendant to restore sample backup tapes, not search them, and defendant claims that it complied with my Order by restoring the tapes (June 22, 2005 Order (Docket Item 19); Def. Reply at 2).

conditioning discovery on the requesting party's payment of the costs of discovery.'"), quoting Oppenheimer Fund, Inc. v. Sanders, supra, 437 U.S. at 358; see generally Crawford-El v. Britton, 523 U.S. 574, 598-99 (1998) ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery.").

Defendant claims that the searches were overly broad because of plaintiff's insistence that the searches include nineteen employees' e-mails and utilize common words as search terms and that as a result of being overly broad, the search has resulted in the production of a vast quantity of documents -- 59,635[16] -- only a minuscule portion of which are relevant (Carey 2d Supp. Aff. ¶ 7; Def. Memo. at 10; Def. Reply at 2-3, 7).[17]

---

[16]Plaintiff's expert contends that this number is inflated since not all of the 59,635 documents came from the Former Employees' files. By plaintiff's calculation, defendant only produced 29,487 documents from the Former Employees (Supplemental Affidavit of David Manber, sworn to December 2, 2005 ("Manber Supp. Aff.") ¶¶ 7-8 and Exhibit A, annexed as Exhibit 1 to Malalis Decl.).

[17]It is troubling that defendant makes this assertion considering that it has admitted that it has not reviewed the produced e-mails for relevancy (Def. Supp. Memo. at 3). As evidence that the majority of the e-mails are irrelevant, defendant states that plaintiff did not ask any questions about documents that came from five of the Former Employees, including Barron, and only asked about five of Austin's e-mails, in the depositions that followed the e-mail production (Defendant's Supplemental Reply Brief in Support of Defendant's Motion to Shift the Cost of the Production of Electronic Discovery ("Def. Supp. Reply") (Docket Item 71) at 6-7). Although one can draw an inference that this suggests many of the documents are

(continued...)

Plaintiff, who at the time of her submission had only partially completed reviewing the e-mails for relevancy (Malalis Decl. ¶ 2), performs two different analyses in an attempt to show that many of the e-mails were relevant.  Because, as explained below, plaintiff's analyses presumed that only five of the Former Employees' e-mails would be considered for cost-shifting, they are not persuasive because I am considering cost-shifting only with respect to Barron's e-mails.  However, I shall still review plainitff's analyses because they are the best available method for determining what percentage of the restored e-mails are relevant.

In her first analysis, plaintiff states that she has reviewed the Former Employees' e-mails that were produced from a sample month, December 2002.  Plaintiff states that there were 301 documents from this month, and found 38 of these documents were responsive and 19 of those 38 relevant.  Thus, plaintiff concludes that 50% of the documents from the sample month are relevant (Malalis Decl. ¶ 26).  Plaintiff claims that 246 of the documents were non-responsive because they were from files which defendant had not been ordered to produce, such as (1) Graham's files, (2) e-mails from the the HR and WPSI drives and (3)

---

[17](...continued)
irrelevant, it does not necessarily mean that the e-mails were irrelevant as there could be a multitude of reasons why plaintiff did not introduce more of the e-mails during depositions.

documents about non-WPSI employees in Austin's e-mail box.[18]   The remaining 17 documents out of the 301 total were duplicates (Manber Supp. Aff. ¶ 10 and Exhibit A).

Defendant argues that this analysis is flawed for two reasons.  First, such a sampling is inherently flawed because there is a stronger likelihood of responsive documents from December 2002 than for other periods covered by the document production (Def. Supp. Reply at 7).  By way of comparison, defendant's search of the e-mails it produced from January 2000 yielded 431 responsive documents, and not one of them, in defendant's view, had "any bearing on the claims or defenses in this case" (Def. Supp. Reply at 8-9 (emphasis omitted); Affidavit of Leila R. Pittaway, Esq., sworn to December 8, 2005 ¶ 1 (Docket Item 72)).  Second, plaintiff wrongfully concluded that the e-mails from Graham, the HR and WPSI drives and Austin's non-WPSI employee e-mails were non-responsive (Def. Supp. Reply at 5, 7).

I agree with defendant that plaintiff wrongfully excluded certain e-mails from this sample and that they should be included in the analysis.  Beginning with Graham's e-mails, although, as stated earlier, defendant was never ordered to produce Graham's e-mails, defendant apparently produced them

_____

[18]The analysis combines the number of Austin's non-WPSI e-mails with the number of blank e-mails, making it impossible to determine how many e-mails came from each category (Manber Supp. Aff. Ex. A).

anyway.  Defendant's decision to produce them was appropriate considering that Graham's e-mails were clearly requested by plaintiff (Document Request ¶ 10; 7/5/05 Tr. at 46).  At one point defendant stated that it did not object to producing e-mails from Graham (7/7/05 Tr. at 72), and no protective order was granted with respect to Graham's e-mails.  Thus, I find Graham's e-mails should be included in determining the total number of responsive documents.

With respect to producing Former Employees' e-mails from the HR and WPSI drives, this issue was also not discussed at the discovery conferences as defendant was simply directed to produce the Former Employees' e-mails; neither side raised an issue as to whether the HR and WPSI drives should be searched and, therefore, my Orders did not address this issue.  Because there was no directive to limit defendant's search to only the individual files of the Former Employees and the HR and WPSI drives apparently contained e-mails from the Former Employees, defendant appropriately produced e-mails from those drives and they too should be included in the analysis.

With respect to Austin's files, I clearly directed defendant to produce e-mails from her files that addressed both WPSI and non-WPSI employees, although I ordered defendant to search more terms for WPSI-related e-mails than for non-WPSI e-

mails.  Thus, these e-mails should also be included for the
purposes of this analysis.

If the e-mails defendant claims plaintiff wrongfully
excluded from her analysis were included, the total number of e-
mails from December 2002 would be approximately 284, excluding
duplicates, but including an unknown number of blank e-mails.
Neither party has reviewed all 284 e-mails for relevance,
however, and thus it is impossible to know how many of the e-
mails are relevant.  Therefore, I do not rely on plaintiff's
first analysis.

In her second analysis, plaintiff claims she reviewed
all the e-mails produced from 2003[19] and found 71 pages of e-
mails that were "highly relevant" (Malalis Supp. Decl. ¶¶ 4,
6).[20]  Plaintiff claims that there are three significant facts
supported by these e-mails:  (1) Parker and other high level
managers exhibited a high level of hostility toward plaintiff on
account of the 2002 bonus, (2) defendant's "skills assessment" of
plaintiff, which defendant claims was created before plaintiff

---

[19]Plaintiff incorrectly states that her analysis includes e-
mails from March through December 2003 only when it actually
includes e-mails from January and February 2003 as well.

[20]Although plaintiff calls this analysis a "qualitative
review," as opposed to the review of December 2002 e-mails which
she terms a "quantitative review," plaintiff does not state
whether the 71 pages of e-mails were the only relevant e-mails
found in the 2003 e-mails.  This omission leads me to believe
that these are in fact the only relevant e-mails produced from
that time period.

was selected for termination, was actually created after she was terminated and (3) defendant planned to document plaintiff's performance deficiencies soon after she returned to work in October 2003 "to lay the groundwork for her discharge" (Malalis Decl. ¶¶ 7, 22).

Defendant claims that this small sampling is representative of the whole production, showing that only a small percentage of the e-mails produced are relevant (Def. Supp. Reply at 8).

Assuming that these 71 pages of e-mails are relevant and support the facts that plaintiff claims they support, they do not provide any direct evidence of discrimination or retaliation linked to plaintiff's complaints. For example, a January 22, 2003 e-mail from Dodo to Austin, Parker and another executive which refers to plaintiff states "I start to think we have to settle with the lady as much as we do not like it" (Malalis 1). Another undated e-mail from Patrick Furer, an executive that may have participated in deciding to terminate plaintiff, to Austin, Dodo and Parker states "[I] am utterly unhappy about proceedings and extremely concerned [sic] setting a precedent here, all of us could rue in the not far away future. [I] can only underline my opinion, that our colleague has[] at max half a leg to stand on for a complaint" (Malalis 4; 7/7/05 Tr. at 68). On May 19, 2003, Dorine McManus, the human resources manager, wrote to Austin,

stating that Parker "would rather [Quinby] leave until things are settled, as opposed to continue to work.  It's uncomfortable" (Malalis 28; Compl. ¶ 39).  In an e-mail from Austin to McManus the following day, Austin refers to a meeting Parker and plaintiff had the previous night and writes "if it is 'wicked' stuff he says today, (especially about what he/she said last night[)]" then "do a little documentation (and get him to also) about what was said last night, it'll be helpful" (Malalis 32). In another e-mail to Austin on May 21, 2003, McManus states that Parker had asked plaintiff to arrive at the office earlier in the day and that he was changing which clients plaintiff would be assigned to.  She further wrote that Parker's "concern is that [Quinby] will say, 'ok they're letting me stay, but making my life miserable.'  If everyone, though, is being treated 'the same,' isn't that okay?  Which is worse, having her stay or go?" (Malalis 30).  On May 22, 2003, Austin wrote to McManus that although the decision to terminate plaintiff had been made, Parker could not fire her immediately because to do so would "wreak[] of retaliation" (Malalis 35).  Dodo wrote to Austin on June 3, 2003 and stated that he would formally "request Parker to produce documentation that substantiates the dismissal of [Quinby]" (Malalis 37).  On June 24, 2003, more than a month after plaintiff learned that she was being terminated, Parker sent McManus a draft memorandum documenting plaintiff's

performance at the bank and noted that "I am confident that there are plenty of justifiable reasons for this decision and that we can find a reasonable solution with [Quinby]" (Malalis 47).

Even though these e-mails may be relevant, and I appreciate that discrimination is frequently subtle and often proven by circumstantial evidence, I find that merely 71 pages of relevant documents from that period of time is quite low when compared to the volume of documents produced, particularly considering that much of the alleged wrongdoing took place in 2003.

          b.  Factor Two:  The
               Availability of Such
               Information From Other Sources

"If the information is available from another source, the marginal utility from the e-discovery is low, and would support cost-shifting." Wiginton v. CB Richard Ellis, Inc., supra, 229 F.R.D. at 574.  Clearly there is no other source for these e-mails since defendant has consistently stated that the e-mails are only available on backup tapes (e.g., Bigelow Supp. Aff. ¶ 6; Def. Reply at 5).

          c.  Weighing Factors One and Two

Given the extremely large volume of defendant's production and the relatively small showing of relevant e-mails

from 2003, during which many of allegations in the complaint took place, I find that the searches were not narrowly tailored to discover relevant information.  Although it is still possible that more relevant documents will be found since neither party has completed reviewing the produced e-mails for relevance, it does not seem likely that the percentage of relevant e-mails will rise by much.  Whatever relevant e-mails are found, however, will presumably only be available by way of backup tapes since defendant admits that all the Former Employees' e-mails are maintained solely on backup tapes.

In light of the low number of relevant e-mails, and in spite of the fact that the e-mails are only on backup tapes, the marginal utility test is low and leans in favor of cost-shifting.

       2.  Cost Issues:  Factors
          Three, Four and Five

          a.  Factor Three:  The Amount in
              Controversy, as Compared to
              the Total Cost of Production

Defendant claims that it has expended $226,266.60 restoring and searching all six Former Employees inaccessible e-mails (Carey 2d Supp. Aff. ¶ 11; Def. Supp. Memo. at 5).[21]

---

[21]The $226,266.60 total includes $151,600.11 for restoring the backup tapes and Kroll Archives and $29,413.17 for searching the restored e-mails.  Defendant does not state how much of the $151,600.11 cost of restoring the data relates to restoring
                    (continued...)

Plaintiff has not set forth an estimate for what her total damages would be if she prevailed at trial.  She states in her brief, however, that her salary in 2000 was $750,000 and that it would probably have been higher in 2005, the year after she was terminated for the second time (Pl. Memo. at 22).  Considering plaintiff's salary, it is clear she has the potential to receive a multi-million dollar recovery in this case.

> As stated in Zubulake III:

> In an ordinary case, a responding party should not be required to pay for the restoration of inaccessible data if the cost of that restoration is significantly disproportionate to the value of the case.  Assuming this to be a multi-million dollar case, the cost of restoration is surely not 'significantly disproportionate' to the projected value of this case. This factor weighs against cost-shifting.

Zubulake III, supra, 216 F.R.D. at 288.

> b.  Factor Four:  The Total Cost
>     of Production Compared to the
>     Resources Available to Each Party

Defendant is a large European commercial bank with assets in excess of €265 billion ("WestLB AG in Brief," at, http://www.westlb.de/cms/sitecontent/westlb/ui/en/wir_ueber_uns.s

---

[21](...continued)
Barron's e-mails alone.  Defendant does, however, submits that the cost of searching Barron's e-mails is $5,957.56 (Carey 2d Supp. Aff. ¶¶ 8-9).  The remainder of the $226,266.60 total includes a premium Kroll added for expediting the restoration and search and the cost of re-formatting some of the files from a .tif to a .dii format.

tandard.gid-N2FkNDZmMzU4OWFmYTIyMWM3N2Q2N2Q0YmU1NmI0OGU_.html
(last visited August 7, 2005), annexed as Exhibit 20 to
Marzigliano Decl.).  Plaintiff's resources are undoubtedly more
limited, though she may be able to pay part of the costs of
electronic discovery considering how much she earned while
employed by WestLB.  "Thus, while this factor weighs against cost
shifting, it does not rule it out."  Zubulake III, supra, 216
F.R.D. at 288.

>            c.  Factor Five:  The Relative
>                Ability of Each Party to
>                Control Costs and Its
>                Incentive to Do So

     "Restoration of backup tapes must generally be done by
an outside vendor."  Zubulake III, supra, 216 F.R.D. at 288.
Defendant claims that it used Kroll as an outside vendor because
Kroll was in the best position to restore and search the Kroll
archives and, additionally, because Kroll had worked with WestLB
on other matters, Kroll was already familiar with WestLB's
computer systems and storage (Def. Memo. at 11; Def. Reply at 9).
Plaintiff claims that Kroll's charges were expensive by industry
standards and that defendant failed to seek competitive bids
(Affidavit of Kevin Faulkner, sworn to September 30, 2005
("Faulkner Aff.") ¶¶ 6-8, annexed as Exhibit 22 to Marzigliano
Decl.; Pl. Memo. at 23).

Although defendant held some control over the costs in that it could have sought competitive bids, defendant understandably thought that using Kroll would be cost efficient considering Kroll had past experience working with WestLB data and the fact that it would be cheaper for Kroll to restore the Kroll Archives.  Plaintiff also held some control over the costs, however, because she initially determined the parameters of the search.  Considering that restoring and searching the backup tapes was necessary and, regardless of the outside vendor, expensive, and also the fact that plaintiff sought a very broad search, I find that this factor weighs slightly in favor of cost-shifting.

        3.   Factor Six:  The Importance
            of the Issues at Stake
            <u>in the Litigation</u>

As stated in <u>Zubulake III</u>, <u>supra</u>, 216 F.R.D. at 289, "[a]lthough this case revolves around a weighty issue -- discrimination in the workplace -- it is hardly unique.  Claims of discrimination are common, and while discrimination is an important problem, this litigation does not present a particularly novel issue."  Accordingly, this factor is neutral. <u>See</u> <u>Zubulake III</u>, <u>supra</u>, 216 F.R.D. at 289.

        4.   Factor Seven:  The Relative
            Benefits to the Parties of
            <u>Obtaining the Information</u>

Defendant correctly argues that plaintiff has more to gain by the electronic discovery.  Plaintiff does not contest this point.  As stated in Zubulake I, supra, 217 F.R.D. at 322, this factor is "the least important because it is fair to presume that the response to a discovery request generally benefits the requesting party."  Accordingly, this factor weighs in favor of cost shifting.

### 5.  Summary and Conclusion

As noted above, the factors are weighed in descending order of importance with the marginal utility test being the most important factor to consider.  The marginal utility test and factors five and seven weigh in favor of cost-shifting, although factor five only slightly so, factors three and four weigh against cost-shifting and factor six is neutral.  Thus, the factors favor cost-shifting.

Even where cost-shifting is granted, the defendant must still pay for the majority of the production because of the presumption that the responding party pays for its discovery costs.  Wiginton v. CB Richard Ellis, Inc., supra, 229 F.R.D. at 577; Zubulake III, supra, 216 F.R.D. 289.  In addition, shifting "a share that is too costly may chill the rights of litigants to pursue meritorious claims."  Zubulake III, supra, 216 F.R.D. 289. In Zubulake, 25% of the costs were shifted.  Zubulake III, supra,

216 F.R.D. at 289.  The amount of cost-shifting should be higher here than it was in Zubualke, however, because (1) in Zubulake the production had not taken place at the time of the cost-shifting decision and it was speculative that the e-mail production would result in relevant e-mails, whereas here production has taken place and it appears that the production resulted in a relatively small portion of relevant documents, and (2) the e-mail searches here were much broader than the search in Zubulake.  Thus, I find that 30% of the costs of restoring and searching Barron's e-mails should be shifted to plaintiff.

Defendant has not stated how much it cost to restore Barron's e-mails, though it claims that it cost $5,957.56 to search Barron's e-mails once they were restored (Carey 2d Supp. Aff. ¶ 9).  Accordingly, defendant is to submit an affidavit setting forth the precise cost of restoring the backup tapes associated with Barron's e-mails within ten (10) days of the issuance of the opinion and order.  If plaintiff chooses to respond to the affidavit, she must do so within ten (10) days of defendant's submission.  Further, if defendant chooses to submit reply papers, it must do so within five (5) days of plaintiff's response.  I emphasize that the parties' submissions are only to address the costs of restoring backup tapes containing Barron's e-mails.

D.   <u>Defendant's Other Costs</u>

Defendant also claims that the costs of expediting the production of backup tapes containing the Former Employees' e-mails and re-converting part of its production into a different format at plaintiff's request should be shifted to plaintiff. With respect to the costs of expediting the production, defendant states that this has added 25% to the cost, raising it from $181,013.28 to $226,266.60 (Carey 2d Supp. Aff. ¶ 11). Defendant has not, however, made any argument as to why this premium should be shifted to plaintiff and, therefore, I find that defendant has not met its burden of showing that this cost should be shifted.

Defendant also seeks to shift its costs of re-producing several e-mails in a different format. Over the course of the production, plaintiff claimed that some of the e-mails were wrongly produced in a ".tif" format instead of the previously agreed upon format, ".dii." Although defendant disputed that the format was incorrect, it agreed to re-produce the e-mails in a .dii format. Defendant seeks to shift all or part of the $5,413.76 cost of re-producing the e-mails (Def. Reply at 3-4; Carey 2d Supp. Aff. ¶ 10). This claim will not be considered, however, because it was raised for the first time in defendant's reply brief. <u>Martin v. Gantner</u>, 05-CV-2157 (ILG), -- F. Supp.2d --, 2006 WL 2216748 at *4 n.5 (E.D.N.Y. Aug. 4, 2006); <u>In re Dobbs</u>, 05 Civ. 9817 (DLC), 2006 WL 2032961 at *2 n.2 (S.D.N.Y.

46

July 20, 2006).  Defendant's initial brief only sought to shift
the costs of restoring and searching backup tapes, not for the
costs of loading the e-mails into a particular format.

IV.  Conclusion

          For the foregoing reasons, defendant's motion for
shifting the costs of a portion of the electronic discovery is
granted to the extent that defendant is entitled to recover 30%
of the costs of restoring and searching backup tapes associated
with producing Barron's e-mails.  Defendant is directed to submit
an affidavit setting forth the costs of restoring these backup
tapes within ten (10) days of this opinion and order.  If
plaintiff chooses to submit responsive papers, she must do so
within ten (10) days of defendant's submission, and, if defendant
chooses to reply, it must do so within five (5) days of
plaintiff's submission.  Defendant's motion is denied in all
other respects.

Dated:     New York, New York
           September 5, 2006

                              SO ORDERED


                              HENRY PITMAN
                              United States Magistrate Judge


47

Copies mailed to:

Kathleen Peratis, Esq.
Carmelyn P. Malalis, Esq.
Outten & Golden LLP
3 Park Avenue, 29th Floor
New York, New York 10016

Dawn Groman, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza
New York, New York 10020